O'BANNON, SECRETARY OF PUBLIC WELFARE OF
PENNSYLVANIA *v.* TOWN COURT NURSING
CENTER ET AL.

No. 78–1318.   Argued November 6, 1979—Decided June 23, 1980

774

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 790. BRENNAN, J., filed a dissenting opinion, *post*, p. 805. MARSHALL, J., took no part in the consideration or decision of the case.

*Norman J. Watkins,* Special Deputy Attorney General of Pennsylvania, argued the cause for petitioner. With him on the briefs was *Edward G. Biester, Jr. Richard A. Allen* argued the cause for the Secretary of Health, Education, and Welfare, respondent under this Court's Rule 21 (4), in support of petitioner. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Babcock, Deputy Solicitor General Easterbrook,* and *William Kanter.*

*Nathan L. Posner* argued the cause for respondents. With him on the brief were *William F. Coyle, Jeffrey B. Albert,* and *Abraham C. Reich.**

---

*Briefs of *amici curiae* urging affirmance were filed by *Michael H. Mar-*

MR. JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether approximately 180 elderly residents of a nursing home operated by Town Court Nursing Center, Inc., have a constitutional right to a hearing before a state or federal agency may revoke the home's authority to provide them with nursing care at government expense. Although we recognize that such a revocation may be harmful to some patients, we hold that they have no constitutional right to participate in the revocation proceedings.

Town Court Nursing Center, Inc. (Town Court), operates a 198-bed nursing home in Philadelphia, Pa. In April 1976 it was certified by the Department of Health, Education, and Welfare (HEW) as a "skilled nursing facility," thereby becoming eligible to receive payments from HEW and from the Pennsylvania Department of Public Welfare (DPW), for providing nursing care services to aged, disabled, and poor persons in need of medical care. After receiving its certification,[1] Town Court entered into formal "provider agreements" with both HEW and DPW. In those agreements HEW and DPW agreed to reimburse Town Court for a period of one year for care provided to persons eligible for Medicare or Medicaid benefits under the Social Security Act,[2] on the condition that Town Court continue to qualify as a skilled nursing facility.

On May 17, 1977, HEW notified Town Court that it

cus, *Gary Roberts, John L. Carroll,* and *Morris Dees* for Jill Harris et al.; by *Kalman Finkel, John E. Kirklin,* and *Philip M. Gassel* for the Legal Aid Society of New York City et al.; and by *Toby S. Edelman* and *Edward C. King* for the National Citizens' Coalition for Nursing Home Reform.

[1] The certification in 1976 was Town Court's second; it had first been certified in 1967. It was decertified in 1974 as a result of substantial noncompliance with both state and federal requirements.

[2] The Medicare Program, see 42 U. S. C. § 1395 *et seq.,* which is primarily for the benefit of the aged and the disabled, is financed and administered entirely by the Federal Government (HEW); the Medicaid Program, see 42 U. S. C. § 1396 *et seq.,* which is primarily designed for the poor, is a cooperative federal-state program.

no longer met the statutory and regulatory standards for skilled nursing facilities and that, consequently, its Medicare provider agreement would not be renewed.[3]   The HEW notice stated that no payments would be made for services rendered after July 17, 1977, explained how Town Court might request reconsideration of the decertification decision, and directed it to notify Medicare beneficiaries that payments were being discontinued.   Three days later DPW notified Town Court that its Medicaid provider agreement would also not be renewed.[4]

---

[3] HEW based its determination on a survey conducted by DPW, which recommended that the home be decertified.   In its notice to Town Court HEW stated in part:

"In order to participate in the Medicare Program, a skilled nursing facility must meet the statutory requirements contained in section 1861 (j) of the Act, 42 USC 1395 x (j), as well as all other health and safety requirements established by the Secretary in subpart J, part 405, title 20 of the Code of Federal Regulations.   A participating skilled nursing facility is required to be in compliance with all of the eighteen conditions of participation for such facilities contained in subpart J.

"On May 8–11, 1977, the Pennsylvania Department of Health performed a survey of your facility.   That survey found that your facility does not comply with seven of the eighteen conditions of participation. The seven conditions not being complied with are:

| "II. | Governing Body and Management | (405.1121) |
| "III. | Medical Direction | (405.1122) |
| "IV. | Physical Services | (405.1123) |
| "V. | Nursing Services | (405.1124) |
| "VIII. | Pharmaceutical Services | (405.1127) |
| "XIII. | Medical Records | (405.1132) |
| "XV. | Physical Environment | (405.1134) |

"Your facility's failure to comply with these conditions of participation precludes renewal of your agreement.   Renewal is also precluded by the fact that your facility has failed to maintain compliance with numerous standards which had previously been determined to be met.   Please refer to 20 CFR 405.1908 (d)."   App. 295a–296a.

[4] The state agency's letter read in part:

"Because the Medicare Program has terminated your participation, the Department of Public Welfare has no alternative but to likewise ter-

Town Court requested HEW to reconsider its termination decision. While the request was pending, Town Court and six of its Medicaid patients[5] filed a complaint in the United States District Court for the Eastern District of Pennsylvania alleging that both the nursing home and the patients were entitled to an evidentiary hearing on the merits of the decertification decision before the Medicaid payments were discontinued. The complaint alleged that termination of the payments would require Town Court to close and would cause the individual plaintiffs to suffer both a loss of benefits and "immediate and irreparable psychological and physical harm." App. 11a.

---

minate your participation under the Medical Assistance Program. The Federal regulations, 45 C. F. R. § 249.33 (a) (9), require that a State medical assistance plan must:

" 'Provide that in the case of skilled nursing facilities certified under the provisions of title XVIII of the Social Security Act, the term of a provider agreement shall be subject to the same terms and conditions and coterminous with the period of approval of eligibility specified by the Secretary pursuant to that title, *and upon notification that an agreement with a facility under title XVIII of the Act has been terminated or cancelled, the single State agency will take appropriate action to terminate the facility's participation under the plan.* A facility whose agreement has been cancelled or otherwise terminated may not be issued another agreement until the reasons which cause the cancellation or termination have been removed and reasonable assurance provided the survey agency that they will not recur.' (emphasis supplied)

"Because of the requirements of HEW, your facility must be terminated from participation in the Medical Assistance Program effective June 18, 1977." *Id.,* at 291a–292a.

[5] At the time the suit was filed, no Town Court residents were Medicare recipients. However, Town Court did have a Medicare provider agreement with HEW, the nonrenewal of which automatically triggered the nonrenewal of its Medicaid agreement. See n. 4, *supra.*

Although the plaintiffs filed their action on behalf of a class of all Medicaid recipients in the home, the District Court never certified the class. Thus, the action has proceeded throughout the Court of Appeals and in this Court as an individual action on behalf of the six named plaintiffs.

The District Court granted a preliminary injunction against DPW and HEW, requiring payments to be continued for new patients as well as for patients already in the home and prohibiting any patient transfers until HEW acted on Town Court's petition for reconsideration. After HEW denied that petition, the District Court dissolved the injunction and denied the plaintiffs any further relief, except that it required HEW and DPW to pay for services actually provided to patients.

Town Court and the six patients filed separate appeals from the denial of the preliminary injunction, as well as a motion, which was subsequently granted, for reinstatement of the injunction pending appeal. The Secretary of HEW cross-appealed from the portion of the District Court's order requiring payment for services rendered after the effective date of the termination. The Secretary of DPW took no appeal and, though named as an appellee, took no position on the merits.

The United States Court of Appeals for the Third Circuit, sitting en banc, unanimously held that there was no constitutional defect in the HEW procedures that denied Town Court an evidentiary hearing until after the termination had become effective and the agency had ceased paying benefits.[6] The

---

[6] Relying on this Court's decision in *Mathews* v. *Eldridge*, 424 U. S. 319, the Court of Appeals held that Town Court's property interests were sufficiently protected by informal pretermination procedures and by the opportunity for an administrative hearing and federal-court review after benefits had been terminated:

"As was true in *Eldridge*, the decision not to renew a provider agreement is an easily documented, sharply focused decision in which issues of credibility and veracity play little role. It is based in most cases upon routine, standard, unbiased reports by health care professionals. Those professionals evaluate the provider in light of well-defined criteria that were developed in the administrative rule-making process. Written submissions are adequate to allow the provider to present his case. Given the extensive documentation that the provider is able to submit in response to the findings of the survey teams, the provider is unlikely to need an eviden-

Court of Appeals came to a different conclusion, however, with respect to the patients' claim to a constitutional right to a pretermination hearing. *Town Court Nursing Center, Inc.* v. *Beal*, 586 F. 2d 280 (1978).[7]

Relying on the reasoning of *Klein* v. *Califano*, 586 F. 2d 250 (CA3 1978) (en banc), decided the same day, a majority of the court concluded that the patients had a constitutionally protected property interest in continued residence at Town Court that gave them a right to a pretermination hearing. In *Klein* the court identified three Medicaid provisions—a statute giving Medicaid recipients the right to obtain services from any qualified facility,[8] a regulation prohibiting certified

tiary hearing in order to present his position more effectively. In any event, there is ample opportunity to expand orally upon written submissions during the exit interview or in discussions during the survey itself. There is opportunity to submit additional evidence after notice of deficiencies is given, and the evidence upon which the recommendation of the survey team is based is disclosed fully to the provider. Moreover, the criteria used to evaluate the provider are well known in advance to the provider, and compliance is readily proved or disproved by written submission. Finally, review by an administrative law judge, by the Appeals Council of HEW, and ultimately by the federal courts, insures that the decision of the Secretary will be thoroughly examined before becoming final.

"As stated in *Eldridge,* the public interest in preserving scarce financial and administrative resources is strong. Given the large number of providers participating in Medicare and the frequent surveys that are required, we believe that the costs of providing pre-termination hearings would be substantial. Further, the public has a strong interest in insuring that elderly and infirm nursing home patients are not required to stay in noncomplying homes longer than is necessary to assure that the provider had adequate notice and opportunity to respond to charges of deficiencies." *Town Court Nursing Center, Inc.* v. *Beal,* 586 F. 2d 266, 277–278 (1978). Town Court did not seek further review of this determination.

[7] At the time the litigation began Frank S. Beal was the Pennsylvania Secretary of Public Welfare. He has since been replaced in that position by Helen B. O'Bannon, the petitioner in this Court.

[8] Title 42 U. S. C. § 1396a (a) (23) (1976 ed., Supp. II) provides, in relevant part:

"[A]ny individual eligible for medical assistance (including drugs) may

facilities from transferring or discharging a patient except for certain specified reasons,[9] and a regulation prohibiting the reduction or termination of financial assistance without a hearing [10]—which, in its view, created a "legitimate entitlement to continued residency at the home of one's choice absent specific cause for transfer." *Id.*, at 258. It then cited the general due process maxim that, whenever a governmental benefit may be withdrawn only for cause, the recipient is entitled to a hearing as to the existence of such cause. See *Memphis Light, Gas & Water Division* v. *Craft*, 436 U. S. 1, 11. Finally, it held that, since the inevitable consequence of decertifying a facility is the transfer of all its residents receiving Medicaid benefits, a decision to decertify should be treated as a decision to transfer, thus triggering the patients' right to a hearing on the issue of whether there is adequate cause for the transfer.[11]

---

obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services. . . ."

The same "free choice of providers" is also guaranteed by 42 CFR § 431.51 (1979).

[9] Title 42 CFR § 405.1121 (k)(4) (1979) requires skilled nursing facilities that are licensed either as Medicaid or Medicare providers to establish written policies and procedures to ensure that each patient admitted to the facility "[i]s transferred or discharged only for medical reasons, or for his welfare or that of other patients, or for nonpayment of his stay (except as prohibited by titles XVIII or XIX of the Social Security Act), and is given reasonable advance notice to ensure orderly transfer or discharge. . . ."

[10] Title 45 CFR § 205.10 (a)(5) (1979) provides, in relevant part, that an "opportunity for a hearing shall be granted to any applicant who requests a hearing because his or her claim for financial assistance . . . or medical assistance is denied, . . . and to any recipient who is aggrieved by any agency action resulting in suspension, reduction, discontinuance, or termination of assistance."

[11] "Because a decision to decertify a nursing home as an unqualified

Applying this reasoning in *Town Court,* six judges held that the patients were entitled to a pretermination hearing on the issue of whether Town Court's Medicare and Medicaid provider agreements should be renewed.[12] The court thus reinstated that portion of the preliminary injunction that prohibited patient transfers until after the patients had been granted a hearing and affirmed that portion that required HEW and DPW to continue paying benefits on behalf of Town Court residents. It then remanded, leaving the nature of the hearing to be accorded the patients to be determined, in the first instance, by the District Court. Three judges dissented, concluding that neither the statutes nor the regulations granted

provider is tantamount to an order to transfer a patient for his welfare, Medicaid residents threatened with transfer are entitled to some form of hearing on the existence of the condition or cause for transfer—whether the home is a qualified provider and whether decertification is for the patients' welfare." 586 F. 2d, at 258.

[12] Three judges joined a brief opinion announcing the judgment of the court authored by Judge Aldisert, which disposed of the case in a summary fashion based on the reasoning of *Klein* v. *Califano.* Judge Adams wrote a concurring opinion, which was also joined by three judges (two of whom also joined Judge Aldisert), in which he attempted to explain more fully the reasoning in *Klein.* Referring to the three provisions relied upon in *Klein,* Judge Adams stated that they

". . . paint three distinct points in the landscape of a 'legitimate claim of entitlement' that Medicaid beneficiaries can assert. Taken alone, the interest created by each of these clauses might be dismissed as not rising to the level of a cognizable property interest. However, when viewed together, they compel the conclusion that they identify three aspects of an 'underlying substantive interest' that enjoys the stature of 'property.' " (Footnote omitted.) 586 F. 2d, at 287.

Judge Adams also relied, to some extent, on the hardship that nursing home residents might suffer if forced to transfer to another home, stating that the "health" and "home" interests the residents possess in remaining in a particular nursing home are "among those that most persons would regard as being encompassed by the protections of the due process clause." *Id.,* at 289. Finally, unlike Judge Aldisert, Judge Adams went on to suggest what types of procedures would be necessary before Medicaid patients could be transferred.

the patients any substantive interest in decertification pro-
ceedings and that they had no constitutionally protected prop-
erty right in uninterrupted occupancy.[13]

---

[13] Chief Judge Seitz summarized his response to the three parts of the
majority's analysis as follows:

"The majority finds that continued residency in the nursing home of
one's choice absent specific cause for transfer is an underlying substantive
interest created by three Medicaid provisions. Under the first, 42 U. S. C.
§ 1396a (a) (23), a Medicaid recipient may obtain medical care 'from any
institution . . . qualified to perform the service or services required.'
Clearly, what the majority characterizes as a recipient's right to obtain
medical care from a 'freely selected provider' is limited to a choice among
institutions which have been determined by the Secretary to be 'qualified.'
Next, the majority's reliance on 45 C. F. R. § 205.10 (a) (5), ensuring a
notice and hearing to a recipient whose benefits are suspended, reduced,
discontinued or terminated, is obviously misplaced. As the majority itself
notes, the decertification of these facilities did not reduce or suspend the
residents' rights to continued benefits.

"Finally, the majority relies upon 45 C. F. R. § 249.12 (a) (1) (ii) (B)
(4), which establishes as one requirement for an institution's certification
that each resident admitted to that institution be 'transferred or discharged
only for medical reasons or for his welfare or that of other patients, or
for nonpayment for his stay.' The majority reads this provision as a
limitation on the Secretary's power to interrupt a recipient's residence at
a particular institution. Clearly, however, this provision is a standard of
conduct imposed by the Secretary upon the provider. Violation of this
standard is one of many grounds for decertifying the offending institution.
See 45 C. F. R. §§ 249.33 (a) (2), 249.10 (b) (15). The provision creates
no 'substantive interest' in the residents vis-a-vis the Secretary.

"Moving to its minor premise, the majority postulates that a decision to
decertify is tantamount to a decision to transfer individual residents.
Practically, of course, this may be a consequence in most cases, at least
where an institution fails to remedy its insufficiencies. Analytically, how-
ever, the two decisions are different. Decertification focuses on the institu-
tion's noncompliance with HEW's standards. The majority does not and
cannot contend that recipients have a right to remain in an institution
that the Secretary has found, by appropriate procedures, to be in sub-
stantial noncompliance with the standards. 'Transfer trauma,' although
a legitimate concern for some residents, is necessarily subordinate to the
threat posed to all residents by substandard conditions." *Id.*, at 295–296.

The Secretary of DPW filed a petition for certiorari, which we granted.[14]   441 U. S. 904.   We now reverse, essentially for the reasons stated by Chief Judge Seitz in his dissent.

[14] The patients urge us to dismiss the petition without reaching the merits on the ground that there is no one before the Court who may properly argue the petitioner's position. Thus, they contend that DPW is foreclosed from arguing here because, although its Secretary was formally an appellee in the Court of Appeals, it deliberately took a neutral position on the merits in that court. And they argue that HEW, which did argue the merits below, is foreclosed from arguing them here because its Secretary did not petition for certiorari. While we accept the patients' argument with respect to the portion of the injunction requiring continued payments for Medicaid patients, we reject it insofar as the main issue presented by the petition—the right of the patients to a pretermination hearing—is concerned.

When the District Court ruled against the patients and Town Court on their right to a pretermination hearing, it nevertheless ordered HEW and DPW to continue making payments for services actually rendered, no doubt to ensure that there would be no break in care or benefits while the patients were being transferred. The patients appealed on the hearing issue, but the HEW Secretary alone cross-appealed on the issue of whether HEW should continue paying benefits assuming that there was no right to a pretermination hearing. The DPW Secretary did not file a cross-appeal, thus accepting the District Court's order that DPW continue paying its share of benefits. Under these circumstances, the DPW Secretary's petition for certiorari could not revive the issue of the propriety of that order. And, since the HEW Secretary did not file a petition for certiorari, we have no occasion to review it now.

However, the patients' jurisdictional argument fails insofar as the hearing issue is concerned. Because it contributes funds to the Medicaid program and has joint supervisory responsibilities with the Federal Government over Medicaid providers, DPW clearly has a sufficient interest in this question to give it standing to argue the merits. And, since it was victorious in the District Court on this issue, there was no need for it to file an appeal in order to keep it alive. Finally, although we would not normally allow a party to make an argument it had not raised below, the fact that the same argument was vigorously asserted by HEW and fully addressed by the Court of Appeals removes any prudential barrier to review that might otherwise exist.

Because he was a party to the proceeding below, the HEW Secretary was automatically joined as a respondent when the DPW Secretary filed his petition in this Court. See this Court's Rule 21 (4). In that capacity, he

At the outset, it is important to remember that this case does not involve the question whether HEW or DPW should, as a matter of administrative efficiency, consult the residents of a nursing home before making a final decision to decertify it.[15] Rather, the question is whether the patients have an interest in receiving benefits for care in a particular facility that entitles them, as a matter of constitutional law, to a hearing before the Government can decertify that facility. The patients have identified two possible sources of such a right. First, they contend that the Medicaid provisions relied upon by the Court of Appeals give them a property right to remain in the home of their choice absent good cause for transfer and therefore entitle them to a hearing on whether such cause exists. Second, they argue that a transfer may have such severe physical or emotional side effects that it is tantamount to a deprivation of life or liberty, which must be preceded by a due process hearing.[16] We find both arguments unpersuasive.[17]

may seek reversal of the judgment of the Court of Appeals on any ground urged in that court.

[15] As Judge Adams pointed out in his concurring opinion, HEW and DPW would no doubt benefit from patient input on the questions whether the facility meets the applicable standards and, if not, whether decertification should be postponed pending attempts to bring the home into compliance. 586 F. 2d, at 292–293. Indeed, HEW recognizes the value of patient input, requiring patient interviews to be conducted under some circumstances as a part of the periodic review of a facility's qualifications. See 42 CFR § 456.608 (1979). The fact that a person may be an important, or even critical, witness does not, however, give him a constitutional right to testify.

[16] The patients cite a number of studies indicating that removal to another home may cause "transfer trauma," increasing the possibility of death or serious illness for elderly, infirm patients. They also argue that associational interests, such as friendship among patients and staff and family ties, may be disrupted if the patients are scattered to other nursing homes, perhaps in other areas of the country. In denying the motion for a preliminary injunction, the District Court did not take evidence or make any findings on the harm that might result from a transfer. Never-

Whether viewed singly or in combination, the Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in the home of one's choice. Title 42 U. S. C. § 1396a (a)(23) (1976 ed., Supp. II) gives recipients the right to choose among a range of *qualified* providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified. But it clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified. Second, although the regulations do protect patients by limiting the circumstances under which a *home* may transfer or discharge a Medicaid recipient, they do not purport to limit the Government's right to make a transfer necessary by decertifying a facility.[18] Finally, since decerti-

theless, we assume for purposes of this decision that there is a risk that some residents may encounter severe emotional and physical hardship as a result of a transfer.

[17] The patients also argue that they are third-party beneficiaries of the provider agreement between DPW and Town Court and that this status somehow entitles them to more than Town Court itself is entitled to—namely, a pretermination hearing. They also argue that a legitimate entitlement to continued care in the home of their choice arises out of Pennsylvania's long history of providing free medical care for those who are indigent. Nothing in the cited Pennsylvania statutes or court decisions, however, purports to create the kind of broad entitlement that the patients claim. In any event, neither of these state-law arguments was advanced in the courts below and therefore neither may provide the basis for an affirmance in this Court.

[18] This regulation is clearly designed to prevent abuses by providers and not to define the Government's obligations or limit its powers in any way. Although the regulation allows a home to transfer or discharge a patient for medical reasons, we may assume that the Government could not order a patient transferred out of a qualified facility simply because it believed such a transfer was medically indicated. In other words, we assume that the statute referred to above would prohibit any such interference with the patient's free choice among qualified providers.

fication does not reduce or terminate a patient's financial assistance, but merely requires him to use it for care at a different facility, regulations granting recipients the right to a hearing prior to a reduction in financial benefits are irrelevant.

In holding that these provisions create a substantive right to remain in the home of one's choice absent specific cause for transfer, the Court of Appeals failed to give proper weight to the contours of the right conferred by the statutes and regulations. As indicated above, while a patient has a right to continued benefits to pay for care in the qualified institution of his choice, he has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified.

The Court of Appeals also erred in treating the Government's decision to decertify Town Court as if it were equivalent in every respect to a decision to transfer an individual patient. Although decertification will inevitably necessitate the transfer of all those patients who remain dependent on Medicaid benefits, it is not the same for purposes of due process analysis as a decision to transfer a particular patient or to deny him financial benefits, based on his individual needs or financial situation.

In the Medicare and the Medicaid Programs the Government has provided needy patients with both direct benefits and indirect benefits. The direct benefits are essentially financial in character; the Government pays for certain medical services and provides procedures to determine whether and how much money should be paid for patient care. The net effect of these direct benefits is to give the patients an opportunity to obtain medical services from providers of their choice that is comparable, if not exactly equal, to the opportunity available to persons who are financially independent. The Government cannot withdraw these direct benefits with-

out giving the patients notice and an opportunity for a hearing on the issue of their eligibility for benefits.[19]

This case does not involve the withdrawal of direct benefits. Rather, it involves the Government's attempt to confer an indirect benefit on Medicaid patients by imposing and enforcing minimum standards of care on facilities like Town Court. When enforcement of those standards requires decertification of a facility, there may be an immediate, adverse impact on some residents. But surely that impact, which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property.

Medicaid patients who are forced to move because their nursing home has been decertified are in no different position for purposes of due process analysis than financially independent residents of a nursing home who are forced to move because the home's state license has been revoked. Both groups of patients are indirect beneficiaries of government programs designed to guarantee a minimum standard of care for patients as a class. Both may be injured by the closing of a home due to revocation of its state license or its decertification as a Medicaid provider. Thus, whether they are private patients or Medicaid patients, some may have difficulty locating other homes they consider suitable or may suffer both emotional and physical harm as a result of the disruption associated with their move. Yet none of these patients would lose the ability to finance his or her continued care in a properly licensed or certified institution. And, while they might have a claim against the nursing home for damages,[20] none would have any claim against the responsible governmental authorities for the deprivation of an interest in life, liberty, or prop-

---

[19] 45 CFR § 205.10 (a) (5) (1979). See also *Goldberg* v. *Kelly*, 397 U. S. 254.

[20] This would, of course, depend on the contract between the patients and the nursing home, if any, and the provisions of the applicable state law.

erty. Their position under these circumstances would be comparable to that of members of a family who have been dependent on an errant father; they may suffer serious trauma if he is deprived of his liberty or property as a consequence of criminal proceedings, but surely they have no constitutional right to participate in his trial or sentencing procedures.

The simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally, provides a sufficient answer to all of the cases on which the patients rely in this Court. Thus, *Memphis Light, Gas & Water Division* v. *Craft,* 436 U. S. 1, involved the direct relationship between a publicly owned utility and its customers; the utility had provided its customers with a legal right to receive continued service as long as they paid their bills. We held that under these circumstances the utility's customers had a constitutional right to a hearing on a disputed bill before their service could be discontinued. But nothing in that case implies that if a public utility found it necessary to cut off service to a nursing home because of delinquent payments, it would be required to offer patients in the home an opportunity to be heard on the merits of the credit dispute. This would be true even if the termination of utility service required the nursing home to close and caused serious inconvenience or harm to patients who would therefore have to move. As in this case, such patients might have rights against the home, and might also have direct relationships with the utility concerning their own domestic service, but they would have no constitutional right to interject themselves into the dispute between the public utility and the home.[21]

---

[21] Similarly, in *Perry* v. *Sindermann,* 408 U. S. 593, and *Arnett* v. *Kennedy,* 416 U. S. 134, the Court was concerned with the direct relationship between a public employer and its employees. The character of that relationship determined whether the employee possessed an expectancy of continued employment that was legally enforceable against his employer—

Over a century ago this Court recognized the principle that the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action. Thus, in the *Legal Tender Cases,* 12 Wall. 457, 551, the Court stated:

> "That provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals."

More recently, in *Martinez* v. *California,* 444 U. S. 277, we rejected the argument made by the parents of a girl murdered by a parolee that a California statute granting absolute immunity to the parole board for its release decisions deprived their daughter of her life without due process of law:

> "A legislative decision that has an incremental impact on the probability that death will result in any given situation—such as setting the speed limit at 55-miles-per-hour instead of 45—cannot be characterized as state action depriving a person of life just because it may set in motion a chain of events that ultimately leads to the random death of an innocent bystander." *Id.,* at 281.

Similarly, the fact that the decertification of a home may lead to severe hardship for some of its elderly residents does not turn the decertification into a governmental decision to impose that harm.[22]

---

or at least could not be terminated by the employer without observing certain minimal safeguards. But those cases raised no question concerning the right of an employee who loses his job as a result of government action directed against a third party.

[22] We, of course, need not and do not hold that a person may never have a right to a hearing before his interests may be indirectly affected by government action. Conceivably, for example, if the Government were acting against one person for the purpose of punishing or restraining

Whatever legal rights these patients may have against Town Court for failing to maintain its status as a qualified skilled nursing home—and we express no opinion on that subject—we hold that the enforcement by HEW and DPW of their valid regulations did not directly affect the patients' legal rights or deprive them of any constitutionally protected interest in life, liberty, or property.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, concurring in the judgment.

Although the Court reaches the result I reach, I find its analysis simplistic and unsatisfactory. I write separately to explain why and to set forth the approach I feel should be followed.

The patients rest their due process claim on two distinct foundations. First, they assert a property interest in continued residence at their home. Second, they claim life and liberty interests tied to their physical and psychological well-being. According to the patients, because each of these interests is threatened directly by decertification, they are constitutionally entitled to a hearing on the propriety of that action. Unlike the Court, I find it necessary to treat these distinct arguments separately.

---

another, the indirectly affected individual might have a constitutional right to some sort of hearing. But in this case the Government is enforcing its regulations against the home for the benefit of the patients as a whole and the home itself has a strong financial incentive to contest its enforcement decision; under these circumstances the parties suffering an indirect adverse effect clearly have no constitutional right to participate in the enforcement proceedings.

## I

In my view, the Court deals far too casually with § 1902 (a)(23) of the Social Security Act, 42 U. S. C. § 1396 (a)(23) (1976 ed., Supp. II), in rejecting the patients' "property" claim.[1] That provision guarantees that a patient may receive nursing home care "from any institution . . . qualified to perform the . . . services . . . who undertakes to provide him such services." The statute thus vests each patient with a broad right to resist governmental removal, which can be disrupted only when the Government establishes the home's noncompliance with program participation requirements. Given this fact and our precedents, one can easily understand why seven judges of the Court of Appeals adopted the patients' argument. It would seem that, because the Government has generated a "justifiable expectation that [the patients] would not be transferred except for misbehavior or upon the occurrence of other specified events," *Vitek* v. *Jones,* 445 U. S. 480, 489 (1980), they are "entitled . . . to the benefits of appropriate procedures in connection with determining the conditions that warranted [their] transfer." *Id.,*

---

[1] I agree with the Court that 45 CFR § 205.10 (a)(5) (1979) does not help the patients. Even assuming that provision might otherwise be relevant, it merely prescribes procedures that must attend removal of a benefit. Thus, it has no bearing on whether a property interest exists. See *Bishop* v. *Wood,* 426 U. S. 341, 345, 347 (1976); Monaghan, Of "Liberty" and "Property," 62 Cornell L. Rev. 405, 442–443, n. 232 (1977). I am less comfortable with the Court's treatment of 42 CFR § 442.311 (c) (1979), restated from 45 CFR § 249.12 (a)(1)(ii)(B)(4) (1976), which limits transfers by the home. After all, "[i]t is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972). Since reliance can be generated by inhibitions on private, as well as governmental, alteration of the status quo, I am inclined to think that this provision, if applicable to Town Court, furnishes some support to the patients' claim of a protected expectancy. Accord, *Brede* v. *Director for Dept. of Health for Hawaii,* 616 F. 2d 407, 410–411 (CA9 1980).

at 490. Especially since the patients assert an interest in a home,[2] I believe their claim to property has substantial force.

I agree with Judge Adams of the Court of Appeals that it "begs the question," *Town Court Nursing Center, Inc.* v. *Beal,* 586 F. 2d 280, 287 (1978) (concurring opinion), to counter this argument with the observation that § 1396 (a)(23) expressly gives the patients only a right to stay in *qualified* facilities. See *ante,* at 785. We have repeatedly rejected as too facile an approach that looks no further than the face of the statute to define the scope of protected expectancies. See *Vitek* v. *Jones,* 445 U. S., at 490–491, and n. 6, citing *Arnett* v. *Kennedy,* 416 U. S. 134 (1974) (concurring and dissenting opinions); The Supreme Court, 1975 Term, 90 Harv. L. Rev. 56, 99 (1976) ("six Justices in *Arnett* must have looked outside the statute to consider the impact of government action on citizen expectations and reliance"). Here, as in numerous cases in which we have recognized protected interests, disqualification of the home is the very condition that alone permits disruption of the status quo and that the patients wish to contest. See *Memphis Light, Gas & Water Div.* v. *Craft,* 436 U. S. 1, 11–12 (1978) ("Because petitioners may terminate service only 'for cause,' respondents assert a 'legitimate claim of entitlement' within the protection of the Due Process Clause") (footnote omitted).

Perhaps aware that its treatment of § 1396 (a)(23) is in some tension with our precedents, the Court launches another

---

[2] It is well recognized that the Due Process Clauses of the United States Constitution grew out of the "law of the land" provision of Magna Carta and its later manifestations in English statutory law. That the home was at the center of those property interests historically sought to be protected by due process is underscored by the fact the phrase "due process of law" first appeared in the following codification: "No man of what state or condition he be, shall be *put out of his lands or tenements* nor taken, nor disinherited, nor put to death, without he be brought to answer by due process of law." 28 Edw. III, ch. 3 (1354) (emphasis added), as quoted in The Constitution of the United States of America, Analysis and Interpretation 1138 (Cong. Research Serv. 1973).

line of analysis. It reasons that "decertification . . . is not the same for purposes of due process analysis as a decision to transfer a particular patient." *Ante,* at 786. I am left wondering why. Certainly, the "real world" effect of the two actions is the same. Thus the Court's assertion will come as cold comfort to patients forced to relocate because of this decision. I also wonder why this analytical differentiation matters in determining whether the patients possess a constitutionally protected interest. Certainly decertification results in the loss of exactly the same interest—the ability to stay in one's home—that a patient subject to an individual transfer suffers. The Court does not explain to my satisfaction why in the latter case, but not in the former, a constitutionally protected interest is affected.

I have no quarrel with the Court's observation that the Due Process Clause generally is unconcerned with "indirect" losses. I fear, however, that such platitudes often submerge analytical complexities in particular cases. Cf. *Sherbert* v. *Verner,* 374 U. S. 398, 404 (1963); *Braunfeld* v. *Brown,* 366 U. S. 599, 607 (1961) (plurality opinion); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 461 (1958); *American Communications Assn.* v. *Douds,* 339 U. S. 382, 402 (1950). I also question whether that generalization has relevance here.[3] Even assuming it does, the Court's treatment of it

---

[3] It seems to me that the indirect character of a harm at least normally has to do with whether state action has "deprived" a person of a protected interest, not with whether a protected interest exists. Thus, in *Martinez* v. *California,* 444 U. S. 277 (1980), a case relied on by the Court, there was no question that the interest destroyed, a woman's life, was constitutionally protected. The Court concluded, however, that the loss of that life was "too remote a consequence" of government conduct to be deemed a deprivation attributable to state action. *Id.,* at 285. I would similarly distinguish the Court's "errant father" and "unpaid utility" hypotheticals as instances where no governmental deprivation occurred. Since the deprivation issue was neither briefed in this Court nor addressed below, I think there is a serious question whether the Court's inquiry into the indirect character of the patient's loss has any place in this case.

leaves me unimpressed. To say that the decertification decision directly affects the home is not to say that it "indirectly" affects the patients. Transfer is not only the "inevitabl[e]," *ante,* at 786, clearly foreseeable consequences of decertification; a basic *purpose* of decertification is to force patients to relocate. Thus, not surprisingly, § 1396 (a)(23) specifically ties the patients' right to continued residence in a home to qualification of the facility. Under these circumstances, I have great difficulty concluding that the patients' loss of their home should be characterized as "indirect and incidental," *ante,* at 787, "consequential," *Meyer* v. *Richmond,* 172 U. S. 82, 94 (1898); "collateral," see *Hannah* v. *Larche,* 363 U. S. 420, 443 (1960); or "remote and indeterminate," *Goodrich* v. *Detroit,* 184 U. S. 432, 437 (1902).[4] To be sure, decertification-induced transfers are designed to benefit patients. See *ante,* at 787. But so are a wide range of other governmental acts that invoke due process protections for the intended beneficiary. See, *e. g., Vitek* v. *Jones, supra; Parham* v. *J. R.,* 442 U. S. 584 (1979). See also *In re Gault,* 387 U. S. 1 (1967). Indeed a basic purpose of affording a hearing in such cases is to test the Government's judgment that its action will in fact prove to be beneficial.

---

[4] Because the "indirectness" of a result inevitably is a question of degree, and because countervailing considerations are likely to appear, I would prefer to treat "indirectness" as, at most, but one factor in the "property interest" calculus, which carries greater or lesser significance depending on the particular case. If I were to agree that the sole question here is whether the patients' loss must be rigidly characterized as either "indirect" or "direct," I doubt that I would reach the result the Court does. And if I did, I would undoubtedly rely on the policy-informed factors identified hereinafter, rather than on an essentially *ipse dixit* judgment informed by strained analogies. This would be so whether the relevant inquiry was whether a property interest exists or whether a deprivation had occurred. Cf. Monaghan, 62 Cornell L. Rev., at 428 (existence of "deprivation . . . depends . . . on such matters as the nature of the invasion, its magnitude, and the character of the justification asserted").

In my view, there exists a more principled and sensible analysis of the patients' "property" claim. Given § 1396 (a) (23), I am forced to concede that the patients have some form of property interest in continued residence at Town Court. And past decisions compel me to observe that where, as here, a substantial restriction inhibits governmental removal of a presently enjoyed benefit, a property interest normally will be recognized.[5] To state a general rule, however, is not to decide a specific case. The Court never has held that *any* substantive restriction upon removal of *any* governmental benefit gives rise to a generalized property interest in its continued enjoyment. Indeed, a majority of the Justices of this Court are already on record as concluding that the term "property" sometimes incorporates limiting characterizations of statutorily bestowed interests. See *Arnett* v. *Kennedy,* 416 U. S. 134 (1974) (plurality opinion); *Goss* v. *Lopez,* 419 U. S. 565, 586–587, and n. 4 (1975) (dissenting opinion). See also *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 856, 860–861 (1977) (opinion concurring in judgment). See generally Van Alstyne, Cracks in

---

[5] See *Memphis Light, Gas & Water Div.* v. *Craft,* 436 U. S. 1, 11 (1978) (receipt of services from public utility not terminable except for "good and sufficient cause"); *Bishop* v. *Wood,* 426 U. S., at 345, n. 8 (finding determinative that public employment was terminable "at will," rather than for cause); *Goss* v. *Lopez,* 419 U. S. 565, 573–574 (1975) (public education must be continued absent "misconduct"); *Board of Regents* v. *Roth,* 408 U. S., at 578 (distinguishing situation where nonrenewal of state college professor's employment authorized only for "sufficient cause"); *Goldberg* v. *Kelly,* 397 U. S. 254, 262 (1970) (public support payments to be continued unless recipient not qualified). See also *Vitek* v. *Jones,* 445 U. S. 480, 488–491 (1980); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 9–11 (1979); *Montanye* v. *Haymes,* 427 U. S. 236, 242 (1976); *Meachum* v. *Fano,* 427 U. S. 215, 226–227 (1976); *Wolff* v. *McDonnell,* 418 U. S. 539, 558 (1974); *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973); *Morrissey* v. *Brewer,* 408 U. S. 471 (1972). See generally *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272, 276 (1856) (Fifth Amendment "cannot be so construed as to leave congress free to make any process 'due process of law,' by its mere will").

"The New Property" Adjudicative Due Process in the Administrative State, 62 Cornell L. Rev. 445, 460–466 (1977). Common sense and sound policy support this recognition of some measure of flexibility in defining "new property" expectancies. Public benefits are not held in fee simple. And even if we analogize the patients' claim to "continued residence" to holdings more familiar to the law of private property—even to interests in homes, such as life tenancies—we would find that those interests are regularly subject to easements, conditions subsequent, possibilities of reverter, and other similar limitations. In short, it does not suffice to say that a litigant holds property. The inquiry also must focus on the dimensions of that interest. See *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972).

The determinative question is whether the litigant holds such a legitimate "claim of entitlement" that the Constitution, rather than the political branches, must define the procedures attending its removal. *Id.,* at 578. Claims of entitlement spring from expectations that are "justifiable," *Vitek* v. *Jones,* 445 U. S., at 489; "protectible," *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 7 (1979); "sufficient," *Bishop* v. *Wood,* 426 U. S. 341, 344 (1976); or "proper," *id.,* at 362 (dissenting opinion). In contrast, the Constitution does not recognize expectancies that are "unilateral," *Board of Regents* v. *Roth,* 408 U. S., at 577, or "too ephemeral and insubstantial." *Meachum* v. *Fano,* 427 U. S. 215, 228 (1976).

To mouth these labels does not advance analysis far. We must look further to determine which set of labels applies to particular constellations of fact. Whether protected entitlements exist and how far they extend, although dependent on subconstitutional rules, see, *e. g., Bishop* v. *Wood, supra,* are ultimately questions of constitutional law. See *Memphis Light, Gas & Water Div.* v. *Craft,* 436 U. S., at 9; Monaghan, Of "Liberty" and "Property," 62 Cornell L. Rev. 405, 435–436 (1977). Application of that law will seldom pose difficulties

when the Government has exercised its option to bestow a benefit wholly at will, see *Bishop* v. *Wood, supra,* or the litigant has identified a "for cause" condition resembling those held to be property-creating in past cases. Cases, however, will not always fit neatly into these categories. And when such cases arise, some new analysis is needed. In my view, that inquiry should be broad-gauged. Reason and shared perceptions should be consulted to define the scope of the claimant's "justifiable" expectations. Nor should constitutional policy be ignored in deciding whether constitutional protections attach. This approach not only permits sensible application of due process protections; it reflects the unremarkable reality that reasonable legal rules themselves comport with reasonable expectations.

In applying this analysis to this case, four distinct considerations convince me that—even though the statutes place a significant substantive restriction on transferring patients—their expectancy in remaining in their home is conditioned upon its status as a qualified provider.

(1) The lengthy process of deciding the disqualification question has intimately involved Town Court. The home has been afforded substantial procedural protections, and, throughout the process, has shared with the patients who wish to stay there an intense interest in keeping the facility certified. These facts are functionally important. Procedural due process seeks to ensure the accurate determination of decisional facts, and informed, unbiased exercises of official discretion. See, *e. g., Fuentes* v. *Shevin,* 407 U. S. 67, 81 (1972); *Morrissey* v. *Brewer,* 408 U. S. 471, 480 (1972). To the extent procedural safeguards achieve these ends, they reduce the likelihood that persons will forfeit important interests without sufficient justification. In this case, since the home had the opportunity and incentive to make the very arguments the patients might make, their due process interest in accurate and informed decisionmaking already, in large measure, was satisfied. This point embodies more than

an abstract argument of policy. "[T]he rights of parties are habitually protected in court by those who act in a representative capacity." *Voeller* v. *Neilston Warehouse Co.,* 311 U. S. 531, 537 (1941). See also *New Orleans Debenture Redemption Co.* v. *Louisiana,* 180 U. S. 320 (1901); *Bernheimer* v. *Converse,* 206 U. S. 516, 532 (1907). Thus, not surprisingly the Court heretofore has recognized that where known rules provide procedures through which we may expect others to protect a property holder's less directly threatened interests, that fact favors viewing compliance with those procedures as defining the outer limits of the property holder's expectancy. See *Kersh Lake Dist.* v. *Johnson,* 309 U. S. 485 (1940); *McCaughey* v. *Lyall,* 224 U. S. 558 (1912).

(2) Town Court is more than a *de facto* representative of the patients' interests; it is the underlying source of the benefit they seek to retain. Again, this fact is important, for the property of a recipient of public benefits must be limited, as a general rule, by the governmental power to remove, through prescribed procedures, the underlying source of those benefits. The Constitution would not have entitled John Kelly to a fair hearing if New York had chosen to disband its public assistance programs rather than to cut off his particular award. See *Goldberg* v. *Kelly,* 397 U. S. 254 (1970). Nor would Texas have had to afford process to Professor Sindermann had it decided for budgetary reasons to close Odessa Junior College. See *Perry* v. *Sindermann,* 408 U. S. 593 (1972). And we would be surprised to learn that Dwight Lopez had a constitutional right to procedures before the Ohio Department of Education suspended classes at Columbus High School for 10 days due to the discovery of faulty electrical wiring requiring that much time for repair work. See *Goss* v. *Lopez,* 419 U. S. 565 (1975). These observations comport with common understanding and shared expectations. A farmer may sue for conversion if his upstream neighbor improperly diverts his water. But both can

only grumble if the spring rains cease and the river runs dry.[6]

(3) That the asserted deprivation of property extends in a nondiscriminatory fashion to some 180 patients also figures in my calculus. See *Dent* v. *West Virginia,* 129 U. S. 114, 124 (1889) (legislation comports with due process if, among other things, "it be general in its operation upon the subjects to which it relates"). "Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meet-

---

[6] This common-sense notion is supported by the Court's holding nearly a century ago in *Fox* v. *Cincinnati,* 104 U. S. 783 (1882). Ohio had dredged the Miami and Erie Canal which had one of its termini at the Ohio River in Cincinnati. Pursuant to statutory authority, the State entered into contracts with owners of land bordering the canal. Under these contracts, the State provided the landowners with water to generate hydraulic power in return for rents. Fox leased water from the State in 1855. In 1863, the State granted Cincinnati a portion of the canal so that a street might be laid. The city built the street, and Fox, alleging that the project ruined his lease, sued the city. The city responded that the State had implicitly rescinded Fox's lease by abandoning the canal. Fox replied that, if this were so, the grant was void because it deprived him of property without due process of law and without just compensation. *Id.,* at 785.

The Court perceived the issue to be "whether there is anything in the lease . . . which prevents the State from making such an abandonment." *Ibid.* It answered the question in the negative. The State could abandon the canal whenever the "public necessities" justified abandonment. *Ibid.* No specific provision in the lease was required "because the right to abandon followed necessarily from the right to build. . . . Every lessee of power took his lease and put up his improvements with full notice of the reserved right of the State to discontinue its canal and stop his supply of water." *Id.,* at 786. See *Kirk* v. *Providence Mill Co.,* 279 U. S. 807 (1929); *Kirk* v. *Maumee Valley Co.,* 279 U. S. 797 (1929). If a State may abandon a canal without invading the "property" of a lessee of its waters, it also generally may "abandon" a college, *Perry* v. *Sindermann,* 408 U. S. 593 (1972), or a high school, *Goss* v. *Lopez,* 419 U. S. 565 (1975), or a nursing home Medicaid provider.

ing or an assembly of the whole." *Bi-Metallic Investment Co.* v. *State Board,* 239 U. S. 441, 445 (1915). See *Bowles* v. *Willingham,* 321 U. S. 503, 519–520 (1944); *Goodrich* v. *Detroit,* 184 U. S., at 438. When governmental action affects more than a few individuals, concerns beyond economy, efficiency, and expedition tip the balance against finding that due process attaches.[7] We may expect that as the sweep of governmental action broadens, so too does the power of the affected group to protect its interests outside rigid constitutionally imposed procedures.[8] Moreover, "the case for due

---

[7] The need for expeditious removal of patients from unsafe and unhealthful homes surely is substantial. See Lieberman, Relocation Research and Social Policy, 14 The Gerontologist 494, 500 (1974) ("Taking individuals out of environments that were sterile and barren and putting them into environments that were more humanizing and demanding produced positive results"). And providing procedures at the usual "meaningful time and in a meaningful manner," *Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965), will inevitably delay beneficial transfer of some nursing home residents. See Brown, An Appraisal of the Nursing Home Enforcement Process, 17 Ariz. L. Rev. 304, 337 (1975) ("While the cases granting a prior hearing [to nursing home operators] seem to reflect judicial concern for the consequences of the proposed action on the patients of the affected facility, the effect has been to allow patients to remain in seriously deficient homes undercutting enforcement activities aimed at remedying these deficiencies"); *id.,* at 338 ("because the homes may be expected to use any available delaying tactics, the process proceeds at a snail's pace").

[8] "General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Bi-Metallic Investment Co.* v. *State Board,* 239 U. S. 441, 445 (1915). Of course, we cannot ignore that this generalization does not always work well in practice. Thus, the Court has recognized that "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities." *United States* v. *Carolene Products Co.,* 304 U. S. 144, 153, n. 4 (1938). While nursing home patients may indeed make up a "minority," they are not so much the victims of social prejudice as of physical

process protection grows stronger as the identity of the persons affected by a government choice becomes clearer; and the case becomes stronger still as the precise nature of the effect on each individual comes more determinately within the decisionmaker's purview. For when government acts in a way that singles out identifiable individuals—in a way that is likely to be premised on suppositions about specific persons— it activates the special concern about being personally *talked to* about the decision rather than simply being *dealt with.*" L. Tribe, American Constitutional Law § 10–7, pp. 503–504 (1978) (emphasis in original). I agree with this general statement and find its "flipside" informative here.

(4) Finally, I find it important that the patients' interest has been jeopardized not at all because of alleged shortcomings on their part. Frequently, significant interests are subjected to adverse action upon a contested finding of fault, impropriety, or incompetence. In these contexts the Court has seldom hesitated to require that a hearing be afforded the "accused." See, *e. g., Dixon* v. *Love,* 431 U. S. 105, 112–113 (1977); *Goss* v. *Lopez,* 419 U. S. 565 (1975); *Wolff* v. *McDonnell,* 418 U. S. 539 (1974); *Arnett* v. *Kennedy,* 416 U. S. 134 (1974). This tendency reflects due process values extending beyond the need for accurate determinations. Affording procedural protections also aims at " 'generating the feeling, so important to a popular government, that justice has been done.' " *Marshall* v. *Jerrico, Inc.,* 446 U. S. 238, 242 (1980), quoting *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 172 (1951) (concurring opinion). It may be that patients' participation in the decertification decision would vaguely heighten their and others' sense of the decision's legitimacy, even though the decision follows

---

infirmity and social neglect. Moreover, concerned friends and relatives or organized interest groups may, and often do, step forward to protect the interests of nursing home patients.

extensive government inspections undertaken with the very object of protecting the patients' interests. Even so, that interest is far less discernible in this context than when a stigmatizing determination of wrongdoing or fault supplements removal of a presently enjoyed benefit. See, *e. g., Goss* v. *Lopez,* 419 U. S., at 574–575. See also *Vitek* v. *Jones,* 445 U. S. 480 (1980).

For these reasons, I am willing to recognize in this case that "the very legislation which 'defines' the 'dimension' of the [patient's] entitlement, while providing a right to [remain in a home] generally, does not establish this right free of [disqualification of the home] in accord with [federal statutory] law." *Goss* v. *Lopez,* 419 U. S., at 586–587 (dissenting opinion).[9]

## II

Citing articles and empirical studies, the patients argue that the trauma of transfer so substantially exacerbates mortality rates, disease, and psychological decline that decertification deprives them of life and liberty.[10] Although the

---

[9] Although basic analytical differences divide the Court and me, I am heartened by the Court's seeming recognition that most, if not all, of the factors I have identified and explained may figure, in future cases, in due process analysis. See *ante,* at 789–790, n. 22.

[10] I question whether the life and liberty issue decided by the Court is properly presented. The District Court refused to extend a preliminary injunction after a brief hearing. In that court, the plaintiffs only touched on the concept of transfer trauma. There was no explicit argument that the patients were threatened with a deprivation of life or liberty; rather, the danger of transfer trauma was noted only as a circumstance raising a likelihood of irreparable injury justifying injunctive relief. See Memorandum of Law in Support of Application for Temporary Restraining Order and Motion for Preliminary Injunction (filed July 20, 1977) (asserting only "taking of property without due process"). The transfer trauma studies cited to this Court were not cited to the District Judge. Testimony regarding transfer trauma was limited to the little-explained assertion of an expert witness that removal would subject some patients in the group to endangerment of their lives or aggravation of their ill-

Court assumes that "transfer trauma" exists, see *ante,* at 784, and n. 16, it goes on to reject this argument. By focusing solely on the "indirectness" of resulting physical and psychological trauma, the Court implies that regardless of the degree of the demonstrated risk that widespread illness or even death attends decertification-induced transfers, it is of no moment. I cannot join such a heartless holding. Earlier this Term, the Court recognized that a liberty interest emanates even from the likelihood that added stigma or harmful treatment might attend transfer from a prison to a mental hospital. *Vitek* v. *Jones, supra;* see also *Parham* v. *J. R.,* 442 U. S., at 601. For me it follows easily that a governmental decision that imposes a high risk of death or serious illness on identifiable patients must be deemed to have an impact on their liberty.[11] Nor am I soothed by the palliative that this harm is "indirect"; in my view, where such drastic consequences attend governmental action, their foreseeability, at least generally, must suffice to require input by those who must endure them. See *Brede* v. *Director for Dept. of Health for Hawaii,* 616 F. 2d 407, 412 (CA9 1980).[12]

---

nesses. App. 252a–253a. In the Court of Appeals, the patients again did not contend that decertification exposed them to a deprivation of life or liberty. See Reply Brief for Appellants in No. 77–2221 et al. (CA3), p. 10 (raising only "property interest" argument). It is to be remembered that this case arises from the refusal to extend a preliminary injunction—an order preceded by limited development of the record and not guided by focused presentation of legal arguments. "[T]his Court above all others must limit its review of interlocutory orders." *Goldstein* v. *Cox,* 396 U. S. 471, 478 (1970).

[11] Blackstone, whose vision of liberty unquestionably. informed the Framers of the Bill of Rights, see *Gannett Co.* v. *DePasquale,* 443 U. S. 368, 424 (1979) (opinion concurring in part and dissenting in part), wrote that "[t]he right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, *his health,* and his reputation." 1 W. Blackstone, Commentaries *129 (emphasis added).

[12] The Court observes that "the fact that the decertification of a home may lead to severe hardship for some of its elderly residents does not

The fact of the matter, however, is that the patients cannot establish that transfer trauma is so substantial a danger as to justify the conclusion that transfers deprive them of life or liberty. Substantial evidence suggests that "transfer trauma" does not exist, and many informed researchers have concluded at least that this danger is unproved.[13] Recognition of a constitutional right plainly cannot rest on such an inconclusive body of research and opinion. It is for this reason, and not for that stated by the Court, that I would reject the patients' claim of a deprivation of life and liberty.

## III

Few statements are more familiar to judges than Holmes' pithy observation that "hard cases make bad law." I fear that the Court's approach to this case may manifest the perhaps equally valid proposition that easy cases make bad law. Sometimes, I suspect, the intuitively sensed obviousness of a case induces a rush to judgment, in which a convenient rationale is too readily embraced without full consideration of its internal coherence or future ramifications. With re-

---

turn the decertification into a governmental decision to impose that harm." *Ante,* at 789. I question the relevance of this observation. When the government erroneously commits a person to a mental hospital, it is not "deci[ding] to impose . . . harm" either. But we have recognized that the risk that such action "may lead to severe hardship" is sufficiently great to justify a hearing for the transferee. *Vitek* v. *Jones,* 445 U. S. 480 (1980).

[13] See Borup, Gallego, & Heffernan, Relocation and its Effect on Mortality, 19 The Gerontologist 135, 136 (1979) (noting that 6 previous studies found increased mortality rates, while 12 did not: "findings have been ambiguous and appear to be contradictory"); *id.,* at 138 (concluding on basis of new study that "relocation does not increase the probability of mortality"); Bourestom & Tars, Alterations in Life Patterns Following Nursing Home Relocation, 14 The Gerontologist 506 (1974); Lieberman, Relocation Research and Social Policy, 14 The Gerontologist 494, 495 (1974).

spect, I express my concern that that path has been followed here.

I concur in the judgment.

Mr. Justice Brennan, dissenting.

Respondents have a constitutionally protected property interest in their " 'legitimate entitlement to continued residency at the home of [their] choice absent specific cause for transfer.' " *Town Court Nursing Center, Inc.* v. *Beal,* 586 F. 2d 280, 286 (CA3 1978) (Adams, J., concurring), quoting *Klein* v. *Califano,* 586 F. 2d 250, 258 (CA3 1978). The statutory and regulatory scheme gives a patient the right to choose any qualified nursing home. 42 U. S. C. §§ 1395a and 1396a (a) (23) (1976 ed., Supp. II). Once a patient has chosen a facility, the scheme carefully protects against undesired transfers by limiting the circumstances under which a home may transfer patients. 42 CFR § 442.311 (c) (1979). And a qualified nursing home, which must have met detailed federal requirements to gain certification, 42 U. S. C. §§ 1395x (j) (1976 ed. and Supp. II) and 1396a (a)(28), cannot be decertified unless the Government can show good cause. See 42 U. S. C. § 1395cc (b)(2) (1976 ed., Supp. II). Thus the scheme is designed to enable a patient to stay in the chosen home unless there is a specific reason to justify a transfer.

Respondent patients chose a home which was, at the time, qualified. They moved into the home reasonably expecting that they would not be forced to move unless, for some sufficient reason, the home became unsuitable for them. The Government's disqualification of the home is, of course, one such reason. Respondents have no right to receive benefits if they choose to live in an unqualified home. That does not mean, however, that they have no right to be heard on the question whether the home is qualified—the answer to which will determine whether they must move to another home and suffer the allegedly great ills encompassed by the term "transfer trauma." See *ante,* at 784–785, n. 16. The Government's

action in withdrawing the home's certification deprives them of the expectation of continued residency created by the statutes and regulations. Under our precedents, they are certainly "entitled . . . to the benefits of appropriate procedures" in connection with the decertification. *Vitek* v. *Jones,* 445 U. S. 480, 490 (1980); *Perry* v. *Sindermann,* 408 U. S. 593 (1972).*

The requirements of due process, to be sure, are flexible and are meant to be practical. See *Mathews* v. *Eldridge,* 424 U. S. 319 (1976); *Morrissey* v. *Brewer,* 408 U. S. 471 (1972). Here, the provider is entitled to formal proceedings in connection with the disqualification of the home. To the extent that patients want to remain in a home, their interests very nearly coincide with the home's own interests. The patients can count on the home to argue that it should not be disqualified. Nevertheless, the patients have some interests which are separate from the interests of the provider, and they could contribute some information relevant to the decertification decision if they were given an opportunity. See *ante,* at 784, n. 15. There is no indication that the patients have been accorded any opportunity to present their views on decertification. Because they were accorded no procedural protection, I dissent.

---

*It is no answer to say that respondents' only right is to stay in a *qualified* home, *ante,* at 785, because whether the home is qualified is precisely the issue to be determined. Nor is it an answer to say that respondents are third parties not "directly" affected by the governmental action. *Ante,* at 786–788. As the Court admits, the regulatory scheme operates for the direct benefit of the patients, *ante,* at 789–790, n. 22, and it generates expectations and reliance just as deserving of protection as other statutory entitlements.