629 F.2d 817
 William YARETSKY, Ralph Cuevas, and The Gray Panthers, New
York Chapter, Plaintiffs-Appellees,
and
Mary Foley, Rae Wolper, Rose Shulman, Bessie Rossoff,
Pauline Ashkenazy, Sadie Birenzweig, Martha Zahl, Edna
Kolman, James Lundy, and Philomena Latona Lundy, on behalf
of themselves and all others similarly situated,
Plaintiffs-Intervenors-Appellants,
v.
Barbara BLUM, Individually and as Acting Commissioner of the
New York State Department of Social Services; Robert Whalen,
M. D., Individually and as Commissioner of the New York
State Department of Health, Defendants-Appellants.
 No. 1234, Docket 80-7197.
 United States Court of Appeals,
Second Circuit.
 Argued June 11, 1980.
Decided Aug. 25, 1980.
 
 John E. Kirklin, Director of Litigation Civil Appeals & Law Reform Unit, The Legal Aid Soc., New York City (David Goldfarb, The Legal Aid Soc., New York City, N. Y. and Charles Robert, Hempstead, N. Y., of counsel), for plaintiffs-appellees.
 David R. Ferguson and Kenneth A. Thomas, Asst. Attys. Gen., New York City (Robert Abrams, Atty. Gen. of the State of New York, George D. Zuckerman, Asst. Sol. Gen., New York City, of counsel), for defendants-appellants.
 Before LUMBARD and MANSFIELD, Circuit Judges, and MEHRTENS, District Judge.*
 LUMBARD, Circuit Judge:
 
 
 1
 Plaintiffs, certified by the district court as that class of persons receiving New York State Medicaid assistance who are residents of nursing homes, were granted a permanent injunction by the District Court for the Southern District, Motley, J., enjoining state authorities and nursing homes from discharging or transferring patients to a different level of care without certain procedural safeguards intended to supplement residents' existing state statutory right to a hearing.[1] Also at issue is the district court's permanent injunction forbidding state officials from reversing a hearing officer decision favorable to a plaintiff class member without having considered the full transcript of the hearing, and the district court's refusal to order the Department of Health, Education and Welfare ("HEW") joined as a party. We affirm the permanent injunction with respect to the due process rights of patients subject to transfer, with some modification; we vacate the district court's injunction with regard to reversals of hearing officer determinations; and we affirm the district court with respect to its refusal to order joinder of HEW.
 
 
 2
 In the past two decades, government has taken responsibility for caring for the medical needs of the elderly. One result of this has been the creation of a system of nursing homes, owned and run by private individuals or charitable organizations, whose population is made up largely of elderly recipients of state and federal assistance. Nursing homes are classified into two types: skilled nursing facilities (SNF's), and health related facilities (HRF's).[2] The latter provide a lower level of care than the former.
 
 
 3
 Through HEW regulations, the federal government mandates a procedure called Utilization Review (UR), a kind of patient audit meant to insure that patients are not kept in SNF's longer than necessary, or in any facility when they no longer need medical attention or custodial care. The regulations provide that decisions on such matters are to be made by a Utilization Review Committee (URC), made up, in part, of physicians not financially interested in the affairs of the particular nursing home.
 
 
 4
 When a patient is transferred from one level of care to another, the State Medicaid authorities review his status and reduce or increase his benefits accordingly and the parties agree that reimbursement rates are "ordinarily" lower for HRF's than for SNF's. A decision to reduce or terminate a patient's Medicaid benefits triggers a federal right (under 42 U.S.C. § 1396a(a)(3) and 45 C.F.R. § 205.10) to a hearing, provided by the state. Plaintiffs claimed in this case that the bare right to such a hearing did not meet the requirements of due process in part because of inherent shortcomings and in part because of the manner in which the state has performed its duty to provide such hearings. In particular the district court found that patients were not given effective written notice of their hearing rights and were not given sufficient access to their medical files to enable them effectively to challenge the transfer decision.
 
 
 5
 In an earlier appeal, we affirmed, insofar as appealed from, a preliminary injunction granted by the district court ordering certain additional procedural due process safeguards with regard to nursing home transfers, prohibiting the state from delegating to nursing homes the responsibility for notifying patients of their hearing rights, and prohibiting the state from not disclosing to the patient medical information deemed harmful to a patient. Yaretsky v. Blum, 592 F.2d 65 (2d Cir. 1979).
 
 
 6
 Before the injunction was made permanent, the parties entered into a consent judgment which embodied most of the procedural safeguards sought by plaintiffs with respect to patient transfers. The consent judgment spelled out the right of the patient or his representative to receive timely notice of the intended transfer; guaranteed the opportunity to have access to all documents in his medical file; made the patient's voluntary permission a prerequisite to transfer; and required that the hearing officer consider a "psychosocial" evaluation of the effect of transfer on the patient.
 
 
 7
 The consent judgment left several issues of the law to be decided by the district court: (1) are due process protections required (a) when a patient is transferred from a lower to a higher level of care, whether the transfer is initiated by a URC or not, and (b) when a patient transfer to a lower level of care is not initiated by a URC; and (2) are state administrative agency decision-makers required by due process or state law to read a verbatim transcript of the hearing before reversing a hearing officer's determination favorable to a member of the plaintiff class?
 
 
 8
 The district court found that patients are entitled to due process when transferred from a lower level of care to a higher one, and when a transfer is initiated by someone other than a URC. We agree because we think such transfers involve state action affecting constitutionally protected property and liberty interests.
 
 
 9
 The Supreme Court has not defined the limits of state action, but it has supplied the following, somewhat sibylline formula: "the existence of 'state action' depends on 'whether there is a sufficiently close nexus between the State and challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.' " Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), quoted in Schlein v. Milford Hospital, Inc., 561 F.2d 427, 428 (2d Cir. 1977). In Jackson, the inaction of a state regulatory commission in failing to veto a clause in a utility's tariff was found insufficient to be state action. In Schlein, the action of a private hospital in rejecting a physician's application for staff privileges was held not to be state action.
 
 
 10
 In the case at bar, however, the state takes a less passive role and responds to the "action" of the "regulated entity". When a nursing home moves a patient from an SNF to an HRF, or when a patient is moved by either the nursing home or a URC to an SNF from an HRF, the state Medicaid authorities adjust the patient's benefits. The state has, in essence, delegated a decision to increase or reduce a public assistance recipient's benefits to a "private" party; but such a delegation cannot prevent due process guarantees from attaching. In Yaretsky v. Blum, supra at 67, we held that the state cannot delegate its due process duty to notify patients of their rights to a hearing.
 
 
 11
 Appellants argue that when a patient's private physician initiates a transfer of his patient from one level of care to another that cannot be said to be state action. This argument misses the mark, because we do not base our finding of state action on the character of the nursing home industry as a regulated industry, nor on the function of providing health care for the elderly as a non-delegable duty of the state. A private physician's decision to transfer his patient can have the same result as a nursing home's-an alteration in the patient's benefits. Since that is the nexus required by Jackson v. Metropolitan Edison, and since that exists equally despite the change in identity of the party initiating the transfer, no exception can be made for physician-initiated transfers.
 
 
 12
 Once it is determined that state action has occurred, the second level of analysis is the identification of a liberty or property interest affected by the state action. In O'Bannon v. Town Court Nursing Home, --- U.S. ----, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), seven justices agreed that nursing home patients did not enjoy a due process right with respect to a decision by HEW to decertify a nursing home. But the O'Bannon majority also clearly recognized due process protection for Medicaid patients when the withdrawal of "direct benefits" under Medicaid programs was involved. --- U.S. at ----, 100 S.Ct. at 2475. These "direct benefits" were characterized by the court as those "essentially financial in character." Thus, in this case, when a patient is transferred from an SNF to an HRF, or from either an SNF or HRF to an adult home providing no medical care, or is simply discharged, a clear property right entitled to constitutional protection is affected. Where a patient is transferred to a higher level of care, there is no similar withdrawal of "essentially financial" "direct benefits." But appellees argue that a patient's interest in avoiding the effects of "transfer trauma" is a constitutionally protected "liberty interest." We agree.
 
 
 13
 In O'Bannon v. Town Court Nursing Home, the majority assumed that "transfer trauma" existed, but reasoned that when such trauma was caused by the action of a third party (i. e., the nursing home) in failing to remain qualified for federal aid, Medicaid recipients did not suffer a "direct" enough injury to make it a deprivation of life, liberty or property. --- U.S. at ----, 100 S.Ct. at 2475. We do not believe, however, that O'Bannon forecloses the question whether there is a liberty interest in avoidance of transfer trauma in this case. The majority's distinction between those rights of Medicaid recipients which are protected by due process ("direct benefits") and those not so protected ("indirect benefits), in the context of which the majority's rejection of reliance on transfer trauma as denial of a liberty interest occurs, is prefaced by the important qualification: "decertification . . . is not the same for purposes of due process analysis as a decision to transfer a particular patient . . . ." --- U.S. at ----, 100 S.Ct. at 2475. Moreover, O'Bannon was not decided on the basis of a record that included much detailed information about the existence of transfer trauma, see --- U.S. at ----, n. 10, 100 S.Ct. at 2484 (Blackmun, J., concurring in the judgment), although one justice, relying on extra-record studies, was convinced that the medical evidence was "inconclusive." --- U.S. at ----, 100 S.Ct. at 2484 (Blackmun, J., concurring in the judgment). We note that the record in this case contains ample evidence that transfer of elderly patients, even when it does not pose an increased risk of mortality, carries with it the undeniable possibility of emotional and psychological harm-at least in the case of many individuals. To us this does not seem any less a "liberty interest" than a prison inmate's interest in not being transferred from a penitentiary to a psychiatric hospital; which interest was accorded constitutional protection in Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980).
 
 
 14
 Having found that state action and a constitutionally cognizable liberty or property interest exists, it follows that the plaintiffs are entitled to due process. But the question of what process is due them requires further consideration, particularly where, as here, plaintiffs are already given, by statute, the right to a hearing. Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), requires a balancing of private interest, risk of erroneous decision, and administrative burdens in formulating the procedural protection required to satisfy due process. We are persuaded that the contours of the relief fashioned by the district court represent an appropriate balancing of the interests recognized in Mathews. In essence, the injunction confirms those due process protections already conferred on Medicaid patients by the language of federal and state statutes and regulations already on the books. Under such circumstances, and absent any argument by appellants that the scope of the remedy is too broad, we affirm the district court's injunction under Mathews.[3]
 
 
 15
 Appellants also argue that the district court's refusal to order an appearance by HEW in this case was an abuse of discretion. Since New York State's eligibility for federal funds reimbursing many of the costs of its Medicaid program depends on HEW's determination that state procedures comply with federal regulations, appellants argue that implementation of the court's injunction may jeopardize New York's approved status. Given such a threat, they argue, HEW should have been brought into the case. Whatever the desirability of such participation, see Yaretsky v. Blum, supra at 70 (Lumbard, J., concurring in part, dissenting in part), we cannot say that the district court abused its discretion. Present in the record in this case is a letter from HEW acknowledging that the post-injunction state of affairs poses no compliance problem for HEW. However, we think it best to modify the injunction to include a provision that if at any time in the future HEW determines that the procedures mandated by this injunction make New York State wholly or partially ineligible for Medicaid reimbursement funds, upon application, the district court shall vacate the injunction.
 
 
 16
 Finally we reach the question of the district court's decision that a decision-maker's failure to rely on hearing transcripts violates the Fourteenth Amendment of the United States Constitution and New York law. We hold that neither the Constitution nor New York law requires the administrative decision-maker in an appeal from a hearing officer recommendation to read (or listen to) the entire transcript (or tape recording) of the hearing before issuing an administratively final decision, whether favorable or adverse to the claimant. Accordingly, we vacate the district court's injunction insofar as it affected the state's administrative practice in this regard.
 
 
 17
 Patients about to be transferred have the right, under federal statute and regulations, 42 U.S.C. § 1396a(a)(3) and 45 C.F.R. § 205.10, to a "fair hearing" provided by the state. This hearing is conducted by a hearing examiner who listens to the testimony, prepares a summary, and makes a recommendation to the Commissioner. Although the parties sharply disagree as to whether or not the hearing officer is empowered to make findings of fact, we do not find that issue controlling and do not decide it. The parties agree that the stenographic or electronic transcript of the hearing is sent to the Department of Social Services in Albany, and that the Commissioner's designees who are responsible for deciding the case do not listen to a tape of the hearing, and that no transcript of the hearing is made prior to their decision. (The chief purpose of the state statutory requirement that a complete electronic or stenographic record of the hearing be kept appears to be to allow judicial review in a proceeding under N.Y.C.P.L.R. Article 78.) The Commissioner's designees follow a set of ten detailed criteria in deciding whether to approve or disapprove the hearing officer's recommendation. If he feels the need, the designee may consult the electronic or stenographic record, but the parties agree that state policy does not require the designee to do so.
 
 
 18
 We believe that, insofar as federal law is concerned, this issue is governed by National Nutritional Foods Assoc. v. FDA, 491 F.2d 1141 (2d Cir. 1974). In National Nutritional, an FDA regulation was challenged on the ground that the Commissioner who signed the order involved could not possibly have reviewed and considered objections to the proposed rule because of their volume during the short period he had been in office at the time he approved the regulation. Like appellees in this case, petitioners in National Nutritional relied on Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936) (Morgan I), which contains the familiar phrase "The one who decides must hear." Id. at 481, 56 S.Ct. at 912. But, as Judge Friendly's opinion in National Nutritional observes, "the life of this aspect of Morgan I was extremely brief. In Morgan IV (United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)) Mr. Justice Frankfurter, writing for a Court unanimous on this point, took back most or all of what the first decision had given." 491 F.2d at 1144.
 
 
 19
 Even the Morgan I case cannot be said to go as far as appellees would argue. As Professor Kenneth Culp Davis has written:
 
 
 20
 Since the only purpose of sifting and analyzing of evidence by subordinates is to save the time of the deciding officers, this necessarily means that deciding officers may "consider and appraise" the evidence by reading a summary or analysis prepared by subordinates. The Supreme Court thus did not require in the First Morgan case that deciding officers must read all the evidence or even that they must directly read any of it. The requirement has to do with personal understanding of the evidence, not with the mechanics by which the understanding is developed. In common practice, deciding officers develop their understanding of evidence not only through reports of subordinates but especially through summaries and explanations in briefs. . . .
 
 
 21
 2 Davis, Administrative Law § 11.03 at 44-45 (1958) (footnotes omitted). See also Bates v. Sponberg, 547 F.2d 325 (6th Cir. 1976) (no violation of due process when decision-making body voted on appeal from an administrative adjudication without reading the transcript, relying on summary report).
 
 
 22
 Under Morgan IV and National Nutritional,[4] an administrative official to whom a decision has been delegated is immune from judicial inquiry "as to the extent of his investigation and knowledge of the points decided, or as to the methods by which he reached his determination."[5] National Nutritional, supra, 491 F.2d at 1145, quoting DeCambra v. Rogers, 189 U.S. 119, 122, 23 S.Ct. 519, 520, 47 L.Ed. 734 (1903). The reasons for this rule derive from the extended, complex nature of the administrative decision-making process, see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 422-23, 91 S.Ct. 814, 826-827, 28 L.Ed.2d 136 (1971) (Blackmun, J., concurring), the difficulty of seeing into the decision-maker's mind, and the enormous volume of administrative decisions which must be made each year. Although, for example, only about 600 appeals from nursing home transfer cases are decided each year in New York State, approximately 68,000 appeals in welfare benefit adjustment cases must be decided in the same period in New York. Such a large administrative burden is an important factor in determining what kind of due process protection must be accorded the subjects of administrative decision-making. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).[6]
 
 
 23
 Appellees also argue that New York law prohibits the administrative practice at issue, citing LaValle v. Blum, 67 A.D.2d 708, 412 N.Y.S.2d 640 (App.Div.2d Dept.1979), Anderson v. Toia, 59 A.D.2d 1024, 399 N.Y.S.2d 763 (App.Div.4th Dept.1977), Halley v. Lavine, 47 A.D.2d 945, 306 N.Y.S.2d 415 (2d Dept.1975), Cruz v. Lavine, 45 A.D.2d 720, 356 N.Y.S.2d 334 (App.Div.2d Dept.1974). Some of these intermediate appellate memorandum opinions are distinguishable on their facts; for example, in Anderson, supra, the fatal defect in administrative procedure seems to have been the fact that "the recording tape ran out" during the recording of the hearing, rather than that the agency decision-maker failed to listen to the tape. And LaValle v. Blum, supra, is most fairly read as standing for the principle that where an agency determination rests on certain facts which are incorrect and which can be found in correct form in a transcript unread by a decision-maker, a court will grant relief under N.Y.C.P.L.R. Art. 78. But Halley v. Lavine, supra, does unequivocally hold that administrative decision-makers must hear or read verbatim transcripts or recordings of fair hearings. Accord, Cruz v. Lavine, supra. Whether these memorandum decisions represent a developing trend among New York's intermediate appellate courts is something the future will reveal.
 
 
 24
 Appellants argue that controlling decisions of the New York Court of Appeals unequivocally show that there is no state law requirement that decision-makers read transcripts, whatever the status of lower court decisions possibly in conflict with the Court of Appeals cases. The first of these cases, Matter of Weekes v. O'Connell, 304 N.Y. 259, 107 N.E.2d 290 (Ct.App.1952), offers little support to appellants. In Weekes, the State Liquor Authority adopted and affirmed a hearing officer's decision in a license revocation case within an hour of the conclusion of the hearing, before the hearing had been transcribed. The Court of Appeals, in an opinion by Chief Judge Fuld, held the Authority's decision invalid seven years later, however, in Matter of Taub v. Pirnie, 3 N.Y.2d 188, 165 N.Y.S.2d 1, 144 N.E.2d 3 (Ct.App.1957), the Court of Appeals, again in an opinion by Chief Judge Fuld, limited Weekes' significance. Taub involved a challenge to a decision by a Zoning Appeals board based on the fact that one member of the board had voted without reading a transcript of the hearing held in the case. Judge Fuld wrote:
 
 
 25
 Courts, we have said, will not " 'probe the mental process' " of the members of an administrative tribunal. Absent a showing, "clearly reveal(ed)," that "they made no independent appraisal and reached no independent conclusion," we will not disturb the decision. As we wrote in the Weekes case, "the extent to which independent study of the evidence in the record is necessary to the required exercise of informed judgment must be left to the wisdom and practical good sense of the commissioners themselves". . . .
 
 
 26
 3 N.Y.2d at 193-94, 165 N.Y.S.2d at 4, 144 N.E.2d at 5.
 
 
 27
 In the Court of Appeals' most recent case in this series, Matter of Wallace v. Murphy, 21 N.Y.2d 433, 288 N.Y.S.2d 487, 235 N.E.2d 759 (Ct.App.1968), involving disciplinary action against a police officer, the Court reiterated its adherence to the Taub doctrine that what is required by law (absent specific statutory provisions requiring more) is only an informed decision, and confirmed Taub's interpretation of Weekes as resting on the Liquor Authority's violation of its own rules and regulations. Id. at 438, 288 N.Y.S.2d 487, 235 N.E.2d 759. Wallace further held that where state law requires a full transcript to be made, that transcript must be "available" to the decision-maker. But Wallace does not hold, and we think the implication is fair that it holds to the contrary, that the decision-maker must take advantage of the transcript's availability in any manner more specific than that required to satisfy Taub's mandate of an exercise of "informed judgment".
 
 
 28
 The Department of Social Services' present practices, as the parties have stipulated, clearly comport with state law requirements that administrative decision-making be an exercise of "informed judgment." The use of the detailed criteria followed by the Department indicate that the decision-maker does much more than rubber-stamp the hearing officer recommendation, and his reliance on summaries and other material prepared by the hearing officer satisfies the state law requirement that his judgment be informed. Moreover, it is clear that Wallace's requirement that where transcripts exist they be available to the decision-maker is satisfied by the Department's practices. The parties have agreed that the electronic recordings of the hearings are forwarded to the Department in Albany, where the decision-maker works. The Department's policy is to have its decision-makers review the electronic transcript only if they feel it would be useful. This practice establishes that the decision-makers have the transcripts "available" in the sense required by Wallace.
 
 
 29
 Accordingly, we reject appellees' argument that state law requires administrative decision-makers to read or listen to complete transcriptions or recordings of hearings before reversing hearing officer recommendations favorable to recipients of benefits conferred by the state.
 
 
 30
 Affirmed in part, vacated in part, and modified.
 
 
 
 *
 Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Lumbard and Mansfield, who are in agreement on this opinion. Judge Mehrtens, Senior District Judge for the Southern District of Florida who was designated to sit on this case and who heard the argument, unfortunately died on July 16, 1980. Although he concurred in the disposition of this case, prior to his death he did not have the opportunity to see this opinion
 
 
 [1]
 At the evidentiary hearing, the patient can challenge his transfer on various substantive grounds derived from state and federal statute and regulations. The most important of these substantive grounds is that his transfer be for "medical reasons"
 
 
 [2]
 At the time this case was tried, there were approximately 95,000 nursing home beds in New York state, including approximately 68,000 SNF beds and 27,000 HRF beds. There were 611 nursing homes in the state, of which 291 were SNF's, 30 were HRF's, and 290 were combination SNF-HRF's
 
 
 [3]
 We note that the October 17, 1979 partial final judgment embodying the parties' consent agreement contains procedural protections for patients subject to UR-initiated transfer considerably more extensive than those granted to patients subject to non-UR transfer under the partial final judgment of February 19, 1980. Only the latter has been appealed, and thus we have no occasion to deal with whether or not the protections embodied in the October 17 stipulations are required by due process or satisfy the principles of Mathews v. Eldridge, supra
 
 
 [4]
 In National Nutritional, our opinion emphasized that the "presumption of regularity" in the actions of administrative decision-makers is especially appropriate "in the context of the promulgation of legislative rules as distinguished from adjudication," 491 F.2d at 1145. The resolution of appeals in nursing home transfer cases is, of course, administrative action of an adjudicative rather than rulemaking type. We see, however, no reason for adopting a different rule in the adjudicative context. Under Mathews v. Eldridge, supra, the administrative burden on the state may be given weight in determining the boundaries of due process protection in both adjudicative and rule-making proceedings; indeed, Mathews itself involved an adjudication. Bates v. Sponberg, 547 F.2d 325 (6th Cir. 1976) also involved an adjudication
 
 
 [5]
 An exception to this general principle exists where there is a showing of misconduct on the part of the agency. See, e. g., Singer Sewing Machine Co. v. NLRB, 329 F.2d 200, 206-08 (4th Cir. 1964)
 
 
 [6]
 Appellees rely also on Ostrowski v. City of New York, 601 F.2d 629 (2d Cir. 1979), which involved a due process challenge to the decision-making procedures used by the Department of Sanitation in disciplinary cases. But the remarks we made concerning federal due proces issues raised by the Department's practices in Ostrowski were dictum, since the case was remanded for findings on state law issues. In any event, as the Ostrowski opinion notes, the decision-maker in that case "did not have a complete record of the hearing." Id. at 631. As noted above, the decision-makers in nursing home transfer cases have available to them the complete record of the hearing