STAFFORD, District Judge.
The plaintiffs are four taxicab companies and the five individuals who own those companies. All four companies operate in the City of Cleveland (the “City”). In this action, the plaintiffs challenge a determination by the City to award to other cab companies the exclusive right to use the outbound queue at the Cleveland Hopkins International Airport (“Hopkins”). The district court granted a preliminary injunction in favor of the plaintiffs, enjoining the City from interfering with the plaintiffs’ right to use the outbound queue at Hopkins. The City appeals from the district court’s preliminary injunction order. Because the plaintiffs have not demonstrated that they are likely to succeed on the merits of their lawsuit, we REVERSE.

BACKGROUND

Each of the individual plaintiffs is a first-generation immigrant whose cab company provides outbound service from Hopkins. Desalegn Sisay, an immigrant from Ethiopia, is the owner and president of ABC Taxi. As of September 2006, ABC Taxi had been in business for three years, dispatched 33 or 34 cabs, and generated less than one million dollars a year in gross revenue. Kashmir Sing, an immigrant from India, is the owner of Airport Taxi. As of September 2006, Airport Taxi had been in business for less than seven years, dispatched less than 50 cabs, and generated less than one million dollars per year in gross income. Abdi Omar, an immigrant from Somalia, is the owner and president of USA Taxi. As of September 2006, USA Taxi had been in business for four years, dispatched approximately 30 cabs, and generated less than one million dollars a year in gross revenue. Jasbir *835 Rondhawa and Harjit S. Dhillon, immigrants from Pakistan, are co-owners of United Cab Company. As of September 2006, United Cab Company had been in business for less than seven years, dispatched less than 50 cabs, and generated less than one million dollars per year in gross income. Each of these individuals and their cabs are licensed under Chapter 443 of the City’s traffic code.
In the City, licenses for cabs and cab drivers are issued by the Commissioner of Assessments and Licenses (the “Commissioner”) pursuant to the traffic code. Chapter 448 of the traffic code governs taxicabs. Among other things, Chapter 443 provides that, with a valid license, cabs may operate “upon the streets of the City.” Ch. 443.02. Licenses are issued annually as of December 1 and expire the following November 30, unless sooner suspended or revoked by the Commissioner. Id. The Commissioner may suspend or revoke licenses granted to any company that fails to perform the duties set forth in Chapter 443.021(a). Ch. 443.022. Absent suspension or revocation, “holders of existing licenses [are] entitled without [a] finding of convenience and necessity to retain their present licenses and secure renewals thereof upon the payment of the annual license fees.” Ch. 443.04(c). Chapter 443 is altogether silent about the operation of cabs at Hopkins.
Hopkins is owned and operated by the City. Chapter 571 of the Municipal Utilities and Services Code governs Hopkins. In particular, in a section entitled “Vehicles for Hire,” Chapter 571 provides that “[n]o person shall operate any vehicle for hire carrying passengers, unless such operation has been approved by the Airport Management and subject to such terms and conditions as may be prescribed.” Ch. 571.13. Prior to 2006, the airport’s taxi service was, in essence, an open system that permitted all City-licensed cabs to line up in the outbound queue to await their turn for fares. The airport did little to regulate — and derived no revenues from— the cabs operating at the airport.
In June of 2006, Ricky D. Smith (“Smith”) was hired as the City’s Director of the Department of Port Control. The responsibility for managing the City’s airports, including Hopkins, lies with the Director of the Department of Port Control. Before he was hired by the City, Smith was the chief operating officer for the Maryland Aviation Administration, which owns and operates the Baltimore/Washington International Thurgood Marshall Airport (“BWI”). Under Smith’s management, BWI established a closed outbound taxi system by contracting with a sole provider for exclusive outbound cab service from BWI.
In September of 2006, at Smith’s behest, the City issued a Request for Proposal (“RFP”) for outbound cab service from Hopkins. In short, the objective of the RFP was to provide a high level of service to patrons of the airport and the air traveling public through a clean, safe and dependable taxicab service. Among other things, the RFP provided that the award would be for an exclusive taxicab service to be operated to and from the airport only. All other taxicab services would be prohibited from picking-up fares at the airport. The RFP included a comprehensive list of minimum standards for cabs and drivers as well as a comprehensive list of minimum operating requirements. The RFP also provided that the successful bidder would be required to pay the airport a facility maintenance fee of fifty cents per outbound trip plus a per trip fee to be proposed by the bidder.
The RFP was, in part, the City’s response to a large number of passenger complaints about the operation of cabs in the queue. The City, through Smith, *836 wanted to address the complaints by establishing a new closed taxi system, a system that was better controlled by the airport, that employed a cab service — limited to 75 cabs — under contract to the airport, and that generated revenues for the airport. Among other things, the proposed exclusive service was intended to reduce what was perceived as an oversupply of cabs in the queue — an oversupply that led to immense competition over fares, rude and aggressive behavior among the cab drivers, and unhappy if not irate customers. As Smith explained:
Under the old arrangement, again where you would have over a hundred, maybe almost 200 taxicabs in the taxi queue at a given time; if you’re a taxi driver, you might get two fares in one day. And so you wait three hours for a fare. And that person, that fare, takes you to Brookpark. So you waited three hours for a fare that takes you to the other side of the airport.
Our experience was that in those cases, occasionally the taxi driver would get upset with the passenger who only wanted to go to Brookpark or Fairview Park because it took them out of the line and they had to go back in the line and wait for a very long period of time.
And this was associated with the number of taxicabs that were relying on the airport.
Although it reflected Smith’s vision, the RFP was developed by several members of the airport staff, headed by Patricia Singleton (“Singleton”), the Chief of Business Development and Management for the Department of Port Control. When developing the RFP, Singleton and her committee talked with consultants and surveyed the industry to get some insight into how exclusive taxi services work at other airports. Among other things, Singleton’s survey work resulted in the inclusion in the RFP of minimum qualifications for bidding cab companies. The minimum qualifications included seven continuous years of experience operating a cab service, not less than 50 cabs traveling simultaneously under a dispatcher, and not less than one million dollars in gross annual revenues. The minimum qualifications were intended to ensure that any cab company using the queue would have both the experience and the financial capacity to provide dependable service. None of the plaintiffs met the minimum qualifications.
The RFP was explained by Smith at an orientation meeting to which all of the City’s cab companies were invited. Of the plaintiffs, only Dhillon attended the orientation meeting. Representatives of Yellow Cab, Ace Taxi Service, and Americab were also in attendance. After the orientation meeting, Smith held a second meeting to which only minority-owned taxicab owners were invited. At this meeting, Smith wanted to give minority business owners an opportunity to respond to the RFP and to express their concerns and challenges outside the presence of majority business owners. Omar and Sisay attended the second meeting. Smith later held a third meeting with a group representing the Taxicab Association. At that meeting, Smith encouraged cab owners to enter into joint ventures and/or subcontracts to minimize the effects of the RFP on individual cab companies.
Three companies — Ace Taxi Service, Yellow Cab, and Americab — submitted proposals in response to the RFP. The three proposals were then submitted to an evaluation committee for review. None of the plaintiffs submitted proposals. After several weeks, the committee — without input from Smith — recommended to Smith that Ace Taxi Service, which is owned by a first-generation immigrant from India, be awarded the bid for outgoing cab service from the queue. Smith then went to City *837 Council to get the necessary legislative authority to award the cab service contract to Ace Taxi Service.
In December of 2006, after hearing testimony, the City Council passed an ordinance giving Smith three options for action: (1) issue permits for cab companies to provide outbound services from Hopkins; (2) enter an agreement with a third-party concessionaire to manage outbound cab services; or (3) issue permits or enter into a concession agreement for operation of an exclusive outbound taxicab concession at Hopkins. Smith responded to the ordinance by joining with the Chief of Staff for the Mayor of Cleveland in seeking a recommendation from the Board of Control regarding the options presented by the City Council. Given its assigned task, the Board of Control established a subcommittee to evaluate the three options, to conduct an independent review of the RFP process as it affected those cab companies that had submitted proposals, and to make a recommendation to Smith. The Board of Control’s task was considered a continuation and not a reopening of the RFP process.
As part of its review process, the Board of Control’s subcommittee interviewed representatives from Ace Taxi Service, Yellow Cab, and Americab, the three companies that had submitted RFP proposals. The subcommittee also interviewed a City Council representative as well as representatives of the evaluation committee. Having submitted no proposals, the plaintiffs were not asked to participate in the subcommittee’s interviews.
The Board of Control ultimately recommended that the airport’s queue service be awarded on a prorated basis to the three taxi companies that had submitted bids, with Ace Taxi Service to receive 35 permits, Yellow Cab to receive 25 permits, and Americab to receive 15 permits. The Board of Control’s recommendation was submitted to the three bidders, who collectively agreed to the prorated arrangement.
In September of 2007, permits were issued to Ace Taxi Service, Yellow Cab, and Americab to operate 35, 25, and 15 cabs respectively. Among other things, these permits specified that the cabs were to be 2007 GPS-equipped models, painted white with airport decals on the sides of the vehicles and with roof lights saying “Airport.” The permits also provided that the drivers “shall operate taxi service exclusively from the airport ... [and] shall not be permitted to pick-up fares off-airport.” The airport’s cab service was thus limited to outbound fares from the queue.
The plaintiffs filed suit against Smith and the City in November of 2007, more than a year after the RFP was issued, two months after queue-service permits were issued to Ace Taxi, Yellow Cab, and Amer-icab, and some weeks after these companies made large capital expenditures for new cabs and equipment as required by the City. The plaintiffs alleged that the defendants (1) breached an implied contract allowing the plaintiffs to provide taxicab service at Hopkins, (2) discriminated against them on the basis of their national origin by not allowing them to provide cab service at Hopkins,[1] (3) violated their procedural due process rights by precluding them from participating in the bidding for an award of the taxicab permits, and (4) violated their right to equal protection. The plaintiffs sought a temporary restraining order, which was denied, and a preliminary injunction, which was granted. While concluding that the plaintiffs were not likely to succeed on their discrimination claim, largely because Ace Taxi Service is owned *838 by a first-generation immigrant from India, the district court found that the plaintiffs had satisfied the prerequisites to a preliminary injunction with regard to their due process claim.[2] In particular, the district court found that (1) the plaintiffs had a property right in their taxicab licenses, the City having conferred that benefit upon them prior to 2006; (2) the defendants failed to articulate a rational basis for the RFP’s minimum qualifications; and (3) the procedure used by the City for soliciting and awarding the bids did not contain many of the protections usually required before effecting the loss of a property interest. The district court accordingly issued an order maintaining the status quo and allowing the plaintiffs to continue to use the outbound queue at Hopkins as they had done previously.
The defendants thereafter filed a timely appeal of the district court’s injunction order. This court denied the defendant’s motion to stay the injunction. While stating that “the defendants have raised serious questions with respect to the merits of their appeal,” the court found “no reason to alter the district court’s evaluation of the balance of harms at this time.” Judge Rogers dissented, stating that he would grant the stay because “of the strong likelihood that the City will prevail on the merits of the procedural due process claim.”

STANDARD OF REVIEW

This court reviews a district court’s grant of a preliminary injunction under an abuse-of-discretion standard. Tucker v. City of Fairfield, 398 F.3d 457, 461 (6th Cir.2005). “A district court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard.” Id.
When considering a motion for preliminary injunction, a district court must consider “(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.” Certified Restoration Dry Cleaning Network v. Tenke Corp., 511 F.3d 535, 542 (6th Cir.2007) (citing Tumblebus Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir.2005)). The district court’s determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed de novo. Id.

DISCUSSION

A. Due Process Claim

The plaintiffs alleged in them complaint that they were excluded from the airport’s outbound queue in violation of their procedural due process rights. To establish a procedural due process claim, the plaintiffs must establish that a state actor deprived them of a life, liberty, or property interest without appropriate process. Bd. of Regents v. Roth, 408 U.S. 564, 569-70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Absent a protected interest, the plaintiffs cannot claim entitlement to the protections of due process. Id. at 569, 92 S.Ct. 2701.
The plaintiffs contend that they have a constitutionally protected property interest in “the right to accept outbound fares at Hopkins pursuant to [them cab] licenses.” The Supreme Court has explained that *839 protected property interests arise not from the Constitution but from “existing rules or understandings that stem from an independent source such as state [or local] law.” Roth, 408 U.S. at 577, 92 S.Ct. 2701. To establish a property interest in a particular benefit, the plaintiffs must demonstrate that they have a “legitimate claim of entitlement” to that benefit. Id. “If an official has unconstrained discretion to deny the benefit, a prospective recipient of that benefit can establish no more than a ‘unilateral expectation’ to it.” Med. Corp., Inc. v. City of Lima, 296 F.3d 404, 409-10 (6th Cir.2002) (quoting Roth, 408 U.S. at 577, 92 S.Ct. 2701). A mere “unilateral expectation” does not constitute a property interest entitled to protection under the Due Process Clause. Roth, 408 U.S. at 577, 92 S.Ct. 2701.
Here, to establish a property interest in the right to use the outbound queue at Hopkins, the plaintiffs “must point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the City to rescind the benefit.” Med. Corp., 296 F.3d at 410. The plaintiffs rely on the cab licenses issued to them pursuant to Chapter 443.[3] To be sure, the licensing of public hacks in the City is governed by Chapter 443 of the City’s traffic code. That ordinance provides that “[n]o public hack shall operate for hire upon the streets of the City without obtaining a license from the Commissioner of Assessments and Licenses.” Ch. 443.02 (emphasis added). Chapter 443 is altogether silent, however, about cab service at Hopkins.
A separate ordinance — Chapter 571, entitled “City Airport” — governs Hopkins. One section of that ordinance explicitly provides that “[n]o person shall operate [at City-owned airports] any vehicle for hire carrying passengers, unless such operation has been approved by the Airport Management and subject to such terms and conditions as may be prescribed.” Ch. 571.13. According to the City, Chapter 571 gives Airport Management unconstrained discretion over the operation of cabs at Hopkins. It follows — the City contends — that the plaintiffs can have no more than a unilateral expectation in the continued use of the outbound queue at the airport, and a unilateral expectation is insufficient to support their due process claim.
The City relies in large part on our decision in Med. Corp., Inc. v. City of Lima, 296 F.3d at 404. As explained in that case, Med Corp. is a private ambulance company licensed to provide ambulance services in the City of Lima, Ohio, where emergency 911 calls from residents are dispatched to licensed ambulance companies on a rotational basis. According to Med Corp., Lima’s Mayor agreed in early 1999 that the City of Lima would dispatch to Med Corp. every other 911 call received by Lima’s emergency dispatch service. Lima had no written policy, procedure, or legislative enactment governing the manner in which 911 calls were allocated to private ambulance companies. In November of 1999, Lima’s Mayor informed Med Corp. of his decision to suspend the dispatch of 911 calls to Med Corp. for a period of one week. The Mayor’s decision was based upon alleged incidents involving Med Corp.’s slow response times and inability to locate addresses within Lima. Med Corp. immediately filed suit against Lima, seeking to enjoin Lima from carrying out its proposed suspension. Med. Corp. alleged that the suspension constituted a deprivation of property and liberty without *840 due process of law. The district court rejected Med Corp.’s due process argument, finding that the company had no property or liberty interest in receiving 911 dispatches.
On appeal, this court affirmed, rejecting Med Corp.’s argument that its license to operate an ambulance in the City of Lima established a property interest in receiving 911 calls. The court wrote:
[I]n order to assert a property interest in receiving 911 calls, Med Corp. must point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the City to rescind the benefit. Med Corp. has not made the required showing. It is undisputed that no written policy or legislative enactment establishes a procedure for maintenance of the 911 dispatch list or limits the discretion of City officials to remove ambulance companies from the list....
... Nothing in the [Municipal] Code ... even mentions 911 calls or the allocation of 911 dispatches by the City. According to the Code, receipt of a license entitles the recipient to engage in the “business or service of the transportation of patients upon the streets, alleys or other public ways or places of the City.” By its own terms, the Code guarantees only the right to do business, not the right to receive particular business opportunities from the city.... There is no explicit guarantee in the Code that an ambulance licensee will receive 911 dispatches from the City, so the Code cannot form the basis for a property right in the continued receipt of 911 dispatches.
Id. at 410-11 (citation omitted).
The plaintiffs try to distinguish Med. Corp. by arguing that, unlike the 911 dispatch service in Med. Corp, the queue scheme at issue here is not wholly discretionary. In their words:
The City has the authority to issue hack licenses under Chapter 443 of the Cleveland Municipal Code. This license grants the holder the right to operate within the city of Cleveland. Chapter 571 of the same code gives the airport management the right to approve the operation of vehicles for hire “subject to such terms and conditions as may be prescribed.” Reading the statute as a whole, Chapter 571 merely gives another city agency the authority to proscribe the terms and conditions under which a licensed cab operator may operate at Hopkins Airport. The scheme is not “wholly discretionary.” (Appellees’ Br. at 20)
We are unpersuaded by the plaintiffs’ argument. The plain language of Chapter 571 confers broad authority upon Airport Management[4] to control vehicles for hire at the airport. Indeed, in no uncertain terms, the ordinance provides that “[n]o person shall operate any vehicle for hire carrying passengers, unless such operation has been approved by the Airport Management and subject to such terms and conditions as may be prescribed.” Ch. 571.13 (emphasis added). The ordinance otherwise places no limits on Airport Management’s authority to either approve or restrict the operation of “any vehicle for hire carrying passengers” at the airport or to decide what terms and conditions may be imposed upon cabs at the airport. Thus, under Chapter 571, Airport Management has the unfettered discretion to decide how and by whom the outbound queue may be used at any particular time.
*841 That Chapter 443 provides generally for the licensing of public hacks for hire “upon the streets of the City” does not mean that Chapter 571 can be construed to mean something other than what it says. It is a well-established canon of statutory construction that, if the text of a law or ordinance is unambiguous, courts must give effect to the plain meaning of that law or ordinance. See, e.g., Connecticut Nat’l Bank v. Germain, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (noting that the Court has “stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there”); United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (explaining that, where a statute’s language is plain, the sole function of the courts is to apply the statute’s ordinary and plain meaning). Moreover, absent a clear intention to the contrary, a specific law will not be controlled or nullified by a general law. Morton v. Mancari, 417 U.S. 535, 550-51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); see also Sprague v. General Motors Corp., 133 F.3d 388, 405 (6th Cir.1998) (noting that, “[a]s a matter of statutory construction, a specific statutory provision governs a general one”). Here, Chapter 571.13 is a specific ordinance that, in plain terms, gives Airport Management unlimited discretion to control the operation of cabs at Hopkins, whether in the outbound queue or elsewhere. We find nothing in the Municipal Code to suggest that the discretion unambiguously conferred by Chapter 571.13 is nullified by the more general licensing provisions contained in Chapter 443.
Because Airport Management’s control over the operation of cabs at the airport is wholly discretionary, the plaintiffs cannot establish that they have a “legitimate claim of entitlement” to use the airport’s outbound queue. At most, they have a “unilateral expectation” based, in part, on the City’s having impliedly consented to the plaintiffs’ use of the queue in the past. Past use, however, cannot form the basis of a property interest absent a legitimate claim of entitlement arising from statute, regulation, contract, or other independent source. As the Supreme Court stated in Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981): “A constitutional entitlement cannot be created — as if by estoppel — merely because a wholly and expressly discretionary state privilege has been granted generously in the past.” Id. at 465, 101 S.Ct. 2460 (internal quotation marks and citation omitted); see also Med Corp., 296 F.3d at 411 (finding no property interest in ambulance company’s receiving 911 calls, despite past receipt of such calls, where there was no municipal code or official policy granting that interest); Blackburn v. City of Marshall, 42 F.3d 925, 940 (5th Cir.1995) (affirming dismissal of the plaintiffs due process claim where the plaintiff — as owner of a towing and wrecker service business — failed to allege that his interest in remaining on the city’s rotational wrecker-referral list stemmed from “a state statute or regulatory scheme, a contract, or any other independent source”).
Citing Med. Corp., the plaintiffs contend that the City’s newly-adopted queue scheme has destroyed the value of their cab licenses and that this “indirect injury” to their licenses supports their due process claim.[5] To be sure, in Med. Corp., 296 *842 F.3d at 413, this court noted that indirect injuries to the value of property may, in some circumstances, constitute constitutional deprivations. The Med. Corp. court also noted, however, that indirect injuries have been recognized as constitutional deprivations only “when such indirect injuries effectively render the property valueless.” Id. (emphasis in original) (internal quotation marks and citation omitted). It was not decided in Med. Corp. that a due process claim may be based upon the indirect loss in the value of a license. Instead, in dicta, the court assumed that, if Med. Corp. could assert a due process claim based upon the indirect loss in the value of its ambulance license, summary judgment for the defendant would nonetheless be appropriate because Med Corp. failed to show that the loss of 911 dispatches would render its ambulance license valueless, even during the time its dispatch privileges were suspended.
Ordinarily, due process protections are not accorded to persons who are indirectly affected by government action. Indeed, long ago, in Legal Tender Cases, 12 Wall. 457, 20 L.Ed. 287 (1870), the Supreme Court wrote:
[The Due Process Clause] has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals.
Id. at 551. In 1980, citing Legal Tender Cases, the Supreme Court reiterated the principle that “due process ... does not apply to the indirect adverse effects of governmental action.” O’Bannon v. Town Court Nursing Center, 447 U.S. 773, 789, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (holding that nursing home residents who asserted a property interest in continued residence at their nursing home had no right to due process before state and federal agencies decertified the home for Medicare and Medicaid purposes, thus threatening the asserted property interests of the residents).[6] More recently, citing O’Bannon, this court found no due process claim where the plaintiff alleged that the government’s change in a regulatory policy resulted in an indirect injury to the plaintiffs license to do business. Nuclear Transport & Storage, Inc. v. United States, 890 F.2d 1348, 1354 (6th Cir.1989).
The plaintiff in Nuclear Transport operated a storage facility for unenriched nuclear feed material owned by utilities and other private entities. The material was kept in storage until it was enriched by the Department of Energy for use as fuel in nuclear power generators. The plaintiff developed its storage facilities and acquired the requisite license for storing un-enriched uranium based, at least in part, on the government’s assurances that it (the government) would not itself provide storage services to its enrichment customers. When the government later changed its policy and began providing storage services for unenriched nuclear feed material, the plaintiffs business allegedly declined by approximately 75%. The plaintiff sued, alleging that the government adversely affected the value of its license without due *843 process of law. The district court dismissed the plaintiffs due process claim based on the plaintiffs failure to assert a constitutionally protected property interest. This court affirmed, stating: “Even if the government has changed its regulatory policy to plaintiffs commercial detriment, plaintiff has alleged no more than an [indirect] injury resulting from government action which does not create entitlement to a hearing.” Id. The court further explained that, because there was nothing in the relevant statute, regulations, or government policy that provided the plaintiff with a constitutionally protected right to provide storage services under its license free of government competition, the plaintiffs license “provided it at most with a mere unilateral expectation that the government would not provide storage space, which is not a property interest entitled to protection.” Id. (internal quotation marks and citation omitted); see also BPNC, Inc. v. Taft, 147 Fed.Appx. 525, 531 (6th Cir.2005) (“holding that lost sales resulting from the state defendants’ alleged defamatory statements constituted an indirect injury from governmental action that was not actionable under the Fourteenth Amendment”).
Consistent with Nuclear Transport, we find that the loss in business suffered by the plaintiffs in this case was an indirect injury that did not create entitlement to due process. In restricting use of the airport’s outbound queue, the City was acting squarely within the discretion granted it under Chapter 571.13. Moreover, nothing in the City’s ordinances suggests that the plaintiffs’ cab licenses conferred a constitutionally protected right to provide cab service at the airport free of restraint by Airport Management or free of any changes by Airport Management in the terms and/or conditions affecting cab service at the airport. When they were originally granted their licenses, and when they renewed those licenses each year thereafter, the plaintiffs had no more than a unilateral expectation that they would be permitted to use the outbound queue at the airport. That unilateral expectation did not constitute a property interest entitled to due process protection.[7] Absent evidence of a constitutionally-protected property interest, the plaintiffs cannot establish likelihood of success on the merits of their due process claim.
B. Equal Protection Claim
Without elaboration, the plaintiffs alleged in their complaint that the City violated their rights to equal protection. In their motion for temporary restraining order and preliminary injunction, the plaintiffs asserted that the City’s newly-adopted queue scheme was “being done for discriminatory reasons and in breach of Plaintiffs’ contract with the City of Cleveland and their due process rights guaranteed under the United States and Ohio Constitutions.” (J.A. 29) They made no mention of an equal protection violation.
After an evidentiary hearing, the district court granted the plaintiffs’ motion for preliminary injunction without addressing the cursory equal protection claim alleged in the plaintiffs’ complaint. The district court instead addressed the plaintiffs’ race discrimination and due process claims, finding that, while the evidence did not support a claim of race discrimination, the plaintiffs had sustained their burden under *844 the Due Process Clause for issuance of a preliminary injunction.[8] In its ensuing remedy order, the district court stated that the plaintiffs “allege[d] that the minimum qualifications in the Request for Proposal (“RFP”) violate[d] the Equal Protection Clause of the Fourteenth Amendment because they arbitrarily discriminate[d] against the owners of the smaller taxicab companies.” (J.A. 48). The district court went on to suggest that, because the City failed to articulate a rational relationship between the RFP’s minimum qualification requirements and a legitimate governmental purpose, the plaintiffs satisfied their burden “to justify the imposition of injunc-tive relief.” The City maintains that the district court erred by placing the burden on the City to sustain the rationality of the RFP’s minimum qualifications.
In Club Italia Soccer & Sports Organization, Inc. v. Charter Township of Shelby, Michigan, 470 F.3d 286 (6th Cir.2006), this court explained what it takes to establish a claim under the Equal Protection Clause as follows:
To establish a claim for relief under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.
When a plaintiff does not allege that the government’s actions burden a fundamental right or target a suspect class, the plaintiff is said to proceed on a so-called “class of one” theory and must prove that the government’s actions lacked any rational basis. Under rational basis scrutiny, government action amounts to a constitutional violation only if it is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government’s actions were irrational. A plaintiff may demonstrate that the government action lacks a rational basis ... either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will.
Under rational basis review, the defendant has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and may be based on rational speculation unsupported by evidence or empirical data. The burden falls squarely to the plaintiff, who must overcome the presumption of rationality by alleging that the defendant acted in a manner clearly contrary to law.
Id. at 298 (internal quotation marks and citations omitted).
Here, having determined that the plaintiffs’ equal protection claim targeted the City’s purported disparate treatment of “smaller taxicab companies” rather than a suspect class, the district court recognized that rational basis scrutiny was required. It appears, however, that the district court failed to recognize that the City was entitled to a presumption of rationality. To overcome that presumption, the plaintiffs were required to prove that the City’s RFP requirements lacked any rational basis. This they failed to do.
Although it had no burden to do so, the City — through the testimony of Ricky Smith, Director of Hopkins, and Pat Singleton, Chief of Business Development and Management for the Department of Port Control — explained the basis for its RFP’s *845 minimum qualification requirements. Singleton explained that the qualifications were based in large part on RFP’s issued by other airports for similar service. Smith stated that, prior to adopting the new taxi scheme, the airport had received a number of complaints from passengers about the taxi sei-vice at the airport. Many of the problems then experienced by the airport were the result of too many taxicabs lining up outside the airport. Smith wanted to reduce the number of cabs in the taxi queue at any given time from the then-current numbers of 100-200 cabs down to 75 cabs, and he wanted an exclusive, fee-generating arrangement with one cab company so that the airport would receive revenue from, and have more control over, the cabs using the queue. In Smith’s words:
[T]he goal there was to — the taxi service is a crucial service to the airport. In essence we’re asking our contractor to be responsible for transporting our passengers from one point to another point safely, and to provide that service in a way that is reliable and dependable.
And so it was incumbent upon us to make sure that that service provider had demonstrated experience at doing that, had the financial capacity to make sure that that continued to happen, and so the minimum requirements simply reflect those conditions.
(A.233) The plaintiffs not only failed to negate every conceivable basis which might support the City’s action, but they also failed to negate the evidence presented by the City. The plaintiffs thus failed to establish that they were likely to succeed on the merits of their equal protection claim.

CONCLUSION

Because the plaintiffs failed to establish that they were likely to succeed on the merits of both them due process and their equal protection claims, they were not entitled to a preliminary injunction. We accordingly REVERSE the district court’s order granting such an injunction.

. The plaintiffs have not challenged on appeal the district court's decision regarding their discrimination claim.

. The district court did not address the plaintiffs' equal protection claim in its memorandum opinion and order granting the plaintiff's motion for preliminary injunction. In a subsequent order addressing the remedy, the district court briefly addressed the equal protection claim, concluding that the City had failed to articulate a rational relationship between the RFP and a legitimate governmental purpose.

. With little discussion or analysis, the district court accepted the plaintiffs assertion of a property interest, stating: “Plaintiffs ... have established a likelihood of showing that they had a protected property interest in providing outbound taxicab service because the City of Cleveland had conferred that benefit upon them.” (A.58-59).

. Chapter 571 defines "Airport Management” to mean the Director of Port Control or his authorized representative. Randy Smith was the Director of Port Control at all times relevant to this lawsuit.

. There is no allegation that the plaintiffs’ cab licenses have been or will be suspended or revoked.

. The O’Bannon Court acknowledged that the principle was not absolute, stating in a footnote:
We of course need not and do not hold that a person may never have a right to a hearing before his interests may be indirectly affected by government action. Conceivably, for example, if the Government were acting against one person for the purpose of punishing or restraining another, the indirectly affected individual might have a constitutional right to some sort of hearing.
O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 789 n. 22, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).

. The City's queue restriction affected only the plaintiffs’ right to use the outbound queue at the airport. This queue restriction did not affect the plaintiffs' right to carry passengers to the airport, or the right to respond to calls from passengers wanting transportation from the airport, or the right to carry passengers anywhere within the City’s streets. While the record establishes that the plaintiffs suffered a loss of business, it does not establish that the plaintiffs’ licenses were rendered valueless.

. The plaintiffs’ did not allege in their complaint or in their motion for preliminary injunction any specifics about how their equal protection rights were violated, which may explain the district court’s failure to address the issue.